## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PARKERVISION, INC.,

                *Plaintiff*,

     v.

QUALCOMM INCORPORATED,
QUALCOMM ATHEROS, INC.,

                *Defendants*.

Case No. 6:14-cv-00687-Orl-40LRH

## DEFENDANTS' *DAUBERT* MOTION TO STRIKE AND EXCLUDE PARKERVISION'S UNRELIABLE AND SPECULATIVE CONJECTURE <u>REGARDING ALLEGED DAMAGES ISSUES</u>

### ORAL ARGUMENT REQUESTED

### PUBLIC/REDACTED DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  LEGAL STANDARDS ......................................................................... 2

III. ARGUMENT ....................................................................................... 2

    A.   Damages Motion #1:  Motion to Exclude Unreliable,
        Speculative Conjecture
        Regarding Alleged Power Consumption Savings ........................... 2

        1.   Striking Dr. Steer's Conjecture Regarding
            "15 Minutes" ................................................................... 3

        2.   Prohibiting Mr. Bone's Opinion on the Value of the
            15 Minutes ....................................................................... 8

    B.   Damages Motion #2:  Motion to Exclude Unsupported
        4G LTE Multimode Chip and SAW Filter Opinions ................... 10

        1.   Striking Conjecture Regarding 4G LTE
            Multimode Chips ............................................................ 12

        2.   Striking Arbitrary SAW Filter Counting ........................... 13

    C.   Damages Motion #3:  Motion to Exclude Mr. Bone's
        RX Opinions ............................................................................. 18

        1.   Mr. Bone Inflates His Rate Using a "Price Premium" ....... 18

        2.   Mr. Bone Impermissibly Taxes Qualcomm for
            Speculative Alleged "Cost Savings" of
            Qualcomm's Customers ................................................... 18

    D.   Damages Motion #4:  Motion to Strike ParkerVision's
        Reliance on the Failed 1998-99 Negotiations .............................. 19

        1.   The 1998-99 Negotiations Were For "Know-How" and
            A Potential Technology Transfer, Not Just For a Bare
            Patent License For the Four Patents-in-Suit ...................... 21

        2.   Mr. Bone Admits There Were At Least Ten Key
            Differences Rendering the 1998-99 Discussions Non-
            Comparable, And Supplies No Facts or Data That
            Could Allow the Jury to Economically Account for
            Those Fundamental Differences ....................................... 22

# TABLE OF CONTENTS
(continued)

Page

3.   Mr. Bone's Reliance on Cherry-Picked Internal Emails
     to Artificially Inflate Damages is Not A
     Reliable Methodology ..................................................... 23

4.   Mr. Bone's Analysis is Fundamentally Flawed Because
     It Does Not Account for Vast Differences, Which
     Render the 1998-99 Discussions Unreliable and
     Irrelevant ......................................................................... 25

# TABLE OF AUTHORITIES

Page

## Cases

*Allison v. McGhan Med.*,
    184 F.3d 1300 (11th Cir. 1999) ....................................................... 6

*Chapman v. Procter & Gamble Distrib.*,
    766 F.3d 1296 (11th Cir. 2014) ................................................... 5, 16

*Clark v. Takata*,
    192 F.3d 750 (7th Cir. 1999) ...................................................... 11

*Deere & Co. v. Int'l Harvester Co.*,
    710 F.2d 1551 (Fed. Cir. 1983) ................................................... 20

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*,
    402 F.3d 1092 (11th Cir. 2005) .................................................... 5

*Hendrix ex rel. G.P. v. Evenflo*,
    609 F.3d 1183 (11th Cir. 2010) .................................................... 4

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................ 15

*Guinn v. AstraZeneca Pharms. LP*,
    602 F.3d 1245 (11th Cir. 2010) ................................................ 13, 16

*Hudgens v. Bell Helicopters*,
    328 F.3d 1329 (11th Cir. 2003) ................................................ 6, 10

*Kilpatrick v. Breg*,
    613 F.3d 1329 (11th Cir. 2010) .................................................... 2

*Kumho Tire v. Carmichael*,
    526 U.S. 137 (1999) ................................................................ 16

*LaserDynamics v. Quanta Comput.*,
    694 F.3d 51 (Fed. Cir. 2012) ....................................................... 2

*Lee-Bolton v. Koppers*,
    319 F.R.D. 346 (N.D. Fla. 2017) ................................................. 14

iii

## TABLE OF AUTHORITIES
(continued)

**Page**

*Lucent Techs. v. Gateway*,
580 F.3d 1301 (Fed. Cir. 2009)....................................................2, 21, 23, 25

*Lyons v. Leatt*,
322 F.R.D. 327 (N.D. Ind. 2017) ............................................................. 14

*McClain v. Metabolife Int'l*,
401 F.3d 1233 (11th Cir. 2005)............................................................2, 13

*MicroStrategy v. Bus. Objects*,
429 F.3d 1344 (Fed. Cir. 2005)............................................................7, 17

*Moore v. GNC, Holdings*,
No. 12-61703, 2014 WL 12684287 (S.D. Fla. Jan. 24, 2014) ............ 10, 14, 15

*NetFuel v. Cisco*,
No. 18-2352, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020)........................ 12

*Omega Patents v. Calamp*,
No. 13-1950, 2015 WL 12830496 (M.D. Fla. Dec. 23, 2015)....................... 10

*Open Text v. Box*,
No. 13-4910, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015)........................... 11

*ParkerVision v. Qualcomm*,
No. 11-719, 2013 WL 12152672 (M.D. Fla. Oct. 11, 2013) .........12, 19, 20, 22

*Power Integrations v. Fairchild Semiconductor*,
711 F.3d 1348 (Fed. Cir. 2013)............................................................8, 24

*Power Integrations v. Fairchild Semiconductor Int'l*,
904 F.3d 965 (Fed. Cir. 2018)..................................................................... 16

*Prisua Eng'g v. Samsung Elecs.*,
No. 16-21761, 2018 U.S. Dist. LEXIS 221548
(S.D. Fla. Feb. 13, 2018)............................................................................. 20

*ResQNet.com v. Lansa*,
594 F.3d 860 (Fed. Cir. 2010)..................................................................... 21

*Uniloc USA v. Microsoft*,
632 F.3d 1292 (Fed. Cir. 2011)............................................................21, 25

# TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Frazier,*
    387 F.3d 1244 (11th Cir. 2004) ................................................................ 12

*Virnetx v. Cisco Sys.,*
    767 F.3d 1308 (Fed. Cir. 2014) .......................................................... 16, 24

*Whitserve v. Comput. Packages,*
    694 F.3d 10 (Fed. Cir. 2012) ............................................................... 9, 20

*Williams v. Mosaic Fertilizer,*
    889 F.3d 1239 (11th Cir. 2018) ................................................................ 2

*Wordtech Sys. v. Integrated Networks Sols.,*
    609 F.3d 1308 (Fed. Cir. 2010) .............................................................. 21

## Other Authorities

Fed. R. Civ. P. 26(a)(2)(B) ....................................................................... 4

Fed. R. Civ. P. 26(a)(2)(B), 37(c) ..................................................... 10, 15

Fed. R. Evid. 401 ...................................................................................... 9

Rule 702 ........................................................................................... *passim*

## TABLE OF EXHIBITS

| Exhibit | Cite | Description |
|---|---|---|
| Gardner Ex. 19 | Steer Opening Rpt. | Excerpt of (pages 47-48) Initial Expert Report of Dr. Michael Steer, dated October 9, 2020 |
| Gardner Ex. 8 | RX Opening Report | Excerpt (pages 216-217) of Initial Expert Report of [ParkerVision's RX Expert], dated October 9, 2020 |
| Gardner Ex. 9 | RX Opening Report | Excerpt (pages 228-30) of Initial Expert Report of [ParkerVision's RX Expert], dated October 9, 2020 |
| Gardner Ex. 20 | Steer Opening Rpt. | Initial Expert Report of Dr. Michael Steer, dated October 9, 2020 |
| Gardner Ex. 10 | RX Opening Rpt.[1] | Initial Expert Report of [ParkerVision's RX Expert], dated October 9, 2020 |
| Gardner Ex. 24 | Bone Rpt. | Expert Report of John R. Bone, dated October 9, 2020 |
| Gardner Ex. 25 | PV1 Benoit Rpt. | Excerpt of the Supplemental Expert Report of Paul C. Benoit, dated March 25, 2013, from *ParkerVision I* |
| Gardner Ex. 27 | PV RX Depo | Deposition transcript of [ParkerVision's RX Expert], dated December 7, 2020 |
| Gardner Ex. 28 | PV RX Depo | Deposition transcript of [ParkerVision's RX Expert], dated December 8, 2020 |
| Gardner Ex. 33 | Bone Depo. | Deposition transcript of John R. Bone, dated December 8, 2020 and errata sheet |

---

[1] ParkerVision contends that the name of its RX technical expert who submitted ParkerVision's opening and rebuttal reports on the "receiver" patents (*i.e.*, the "RX" patents-in-suit) issues is confidential. (*E.g.*, Dkt. 464 (sealing motion), Dkt. 473; *cf.* Dkt. 470; Dkt. 479.) Defendants thus refer to that expert as ParkerVision's "RX" expert or "RX" technical expert. The "RX patents" refers to U.S. Patent Nos. 7,218,907, 7,865,177, and the "TX patents" refers to U.S. Patent Nos. 6,091,940, 7,039,372.

| Exhibit | Cite | Description |
|---|---|---|
| Gardner Ex. 41 | 12/4/2020 Sorrells Depo | Excerpt of the deposition transcript of David F. Sorrells, dated December 4, 2020 |
| Gardner Ex. 45 | 1/29/21 Steer Depo. | Excerpt of the deposition transcript of Michael B. Steer, dated January 29, 2021 |
| Gardner Ex. 49 | Mulhern Depo | Excerpts of the deposition transcript of Carla Mulhern, dated December 10, 2020 |
| Gardner Ex. 58 | QC Rog. No. 10 Resp. | Qualcomm's Objections and Responses to ParkerVision's Second Set of Common Interrogatories (Nos. 9-12), dated December 7, 2015 |
| Gardner Ex. 59 | QC Rog. No. 10 Resp. | Excerpts of Qualcomm's First Supplemental Responses and Objections to ParkerVision's Second Set of Common Interrogatories (9-12), dated September 14, 2020 |
| Gardner Ex. 68 | QCPVII00050565 | Document, bates numbered QCPVII00050565 through QCPVII00050685 |
| Gardner Ex. 69 | QCPV009981961 | Excerpts of document, bates numbered QCPV009981961 through QCPV009982019 |
| Gardner Ex. 70 | QCPV007605674 | Excerpts of document, bates numbered QCPV007605674 through QCPV007605702 |
| Gardner Ex. 71 | QCPV001390354 | Document, bates numbered QCPV001390354 through QCPV001390358 |
| Gardner Ex. 72 | QCPV010492373 | Document, bates numbered QCPV010492373 through QCPV010492394 |
| Gardner Ex. 73 | QCPV001389883 | Document, bates numbered QCPV001389883 through QCPV001389894 |

| Exhibit | Cite | Description |
|---|---|---|
| Gardner Ex. 74 | QCPV001556376 | Document, bates numbered QCPV001556376 through QCPV001556387 |
| Gardner Ex. 75 | QCPV001556329 | Email, bates numbered QCPV001556329 through QCPV001556337 |
| Gardner Ex. 76 | QCPV001547450 | Email, bates numbered QCPV001547450 through QCPV001547451 |
| Gardner Ex. 77 | QCPV001562166 | Email, bates numbered QCPV001562166 through QCPV001562167 |
| Gardner Ex. 78 | QCPV001413479 | Document, bates numbered QCPV001413479 through QCPV001413483 |
| Williams Ex. A | Williams Opening Rpt., | Williams Opening Report, dated October 9, 2020 |
| Williams Ex. B | Williams Reb. Rpt. | Williams Rebuttal Report, dated November 23, 2020 |

## I.   INTRODUCTION

Over the last two decades, ParkerVision has amassed a portfolio of over 130 patents—most claiming the same alleged invention using different words. That entire portfolio has generated only ████████ *total* in licensing revenue. Of that amount, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ ParkerVision later abandoned against Qualcomm.  Nevertheless, ParkerVision now submits a report from an alleged damages expert that argues that Qualcomm should pay a "reasonable royalty" of ████████ for only four of ParkerVision's patents.

The Federal Circuit rigorously enforces the reliability requirements for expert testimony to foreclose the exact type of extravagant damages claim that ParkerVision makes here.  ParkerVision's expert, John Bone, falls short of the Federal Circuit's requirements miserably.  Given ParkerVision's decades of failed licensing efforts, a rigorous, objective analysis of the evidence would not result in a "reasonable royalty" anywhere near the ballpark that Mr. Bone proposes. Instead, to get to his startling number, Mr. Bone based his opinions on arbitrary alleged power savings, unsupported assumptions about SAW filters and 4G LTE multimode chips, and proposals made during failed negotiations.  The multitude of unreliable and unsubstantiated steps in Mr. Bone's analysis results in a complete failure to present sound economic proof.  His opinions should be stricken.

## II.   LEGAL STANDARDS

Rule 702 makes expert testimony admissible only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Williams v. Mosaic Fertilizer*, 889 F.3d 1239, 1244 (11th Cir. 2018).   The burden of establishing qualification, reliability, and helpfulness rests with the proponent. *McClain v. Metabolife Int'l*, 401 F.3d 1233, 1238, 1255 (11th Cir. 2005).  Methodologies must be reliable; *Daubert* is not merely about "qualifications." *Kilpatrick v. Breg*, 613 F.3d 1329, 1336 (11th Cir. 2010).

## III.   ARGUMENT

### A.   Damages Motion #1:  Motion to Exclude Unreliable, Speculative Conjecture Regarding Alleged Power Consumption Savings

The Federal Circuit has repeatedly scrutinized large damage awards to ensure that courts have performed their gatekeeping function. *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1338 (Fed. Cir. 2009) (vacating $357 million verdict); *LaserDynamics v. Quanta Comput.*, 694 F.3d 51, 66-69, 82 (Fed. Cir. 2012) (remanding for third damages trial).   Under *Daubert*, trial courts must "act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *Williams*, 889 F.3d at 1244 (internal citations and quotations omitted).  Mr. Bone's opinions for the two "TX patents" are just that—speculative and unreliable.  To reach an astronomical ▆▆▆▆▆▆ royalty for the two patents—a royalty that is ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ that ParkerVision has generated from its entire

2

portfolio over its more than 20 year life—Mr. Bone relies on ParkerVision's technical expert, Dr. Steer, to speculate that (1) ParkerVision's "Patented Technology" provides "at least 15 minutes" of additional "talk time" on a hypothetical phone he never tested and (2) Qualcomm would have valued these 15 minutes at ▐▐▐▐▐▐▐" (Bone Rpt., ¶¶ 499, 618, Gardner Ex. 24.)  Neither assumption is supported by "sufficient facts or data," is the product of "reliable principles," or is even tied to the patents-in-suit, accused products, or accused functionality.  Fed. R. Evid. 702.  The jury should never hear Mr. Bone's opinions, and ParkerVision should be precluded from arguing that its TX patents provide any additional talk time and any alleged value.

### 1.    Striking Dr. Steer's Conjecture Regarding "15 Minutes"

Mr. Bone is "not a technical expert" (Bone Depo. 25:4-6, Gardner Ex. 33) and consequently "relied on Dr. Steer's opinion." (Bone Rpt., ¶ 499; Bone Depo. 197:10-13.) But the input Mr. Bone received from Dr. Steer is unreliable conjecture and therefore inadmissible.

Dr. Steer just followed ParkerVision's lead in offering an opinion regarding additional "talk time."  Indeed, his report all but admits that ParkerVision's lawyers fed him the conclusion they wanted:  "I have been asked to offer my opinion on whether ParkerVision's inventions enabled Qualcomm's Accused Transmitters to support at least 15 minutes of additional talk time compared to conventional transmitter architectures."  (Steer Opening Rpt., ¶ 111, Gardner Ex. 19.)

Dr. Steer's entire opinion on the 15 minutes, and all of the evidence with which he supports it, are confined to a single paragraph in his report:

> 111.  I have been asked to offer my opinion on whether ParkerVision's inventions enabled Qualcomm's Accused Transmitters to support at least 15 minutes of additional talk time compared to conventional transmitter architectures.   For the reasons discussed above,[2] ParkerVision's inventions enable, at the very least, 15 minutes of additional talk time over alternative designs. This understanding is confirmed by Qualcomm's technical documents.   For example,



> QCPV006315570 (GZIF3 Objective Specification) at QCPV006315576; QCPV011474476 (RTR 6275 Product Council) at QCPV011474502.
> Likewise,



> Accordingly, one can safely conclude that at least 15 minutes of talk time (and likely much more) is attributable to ParkerVision's transmitter technology.

(Steer Opening Rpt., pp. 47-48 (emphasis added), Gardner Ex. 19.)[3]  This scant discussion of an issue that is the foundation for a ▆▆▆▆▆ damages claim is not enough to reliably show that the alleged ParkerVision invention resulted in any increase in talk time.  *Hendrix ex rel. G.P. v. Evenflo*, 609 F.3d 1183, 1203

---

[2] Despite this reference, nowhere else in his report does Dr. Steer address the 15 minutes, let alone with sufficient evidence or analysis to satisfy *Daubert*.  (*See* Steer Opening Rpt., Gardner Ex. 20.)

[3] All of Dr. Steer's opinions had to be included in his report. Fed. R. Civ. P. 26(a)(2)(B) ("complete statement of all opinions … and the basis" and "the facts or data considered").

(11th Cir. 2010) (excluding testimony where there was not "reliable evidence" that brain injury *causes* autism).

*First*, Dr. Steer's opinion is not "based on sufficient facts or data." Fed. R. Evid. 702. Dr. Steer conducts no testing, no simulations, no surveys, and cites no evidence showing that practicing the asserted patents results in 15 minutes of additional talk time for each accused product compared to non-accused products. He did not test any of the accused products, let alone all of them. *Chapman v. Procter & Gamble Distrib.*, 766 F.3d 1296, 1311-12 (11th Cir. 2014) ("Hypotheses are verified by testing, not by submitting them to lay juries for a vote.") (citation omitted). He offers no facts and no scientifically sound evidence for the "15 minutes." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (testimony "unsubstantiated by any factual basis" is unhelpful). Instead, he bases his opinion on a few cherry-picked pages that discuss "talk current" and "current consumption"—not talk time.

The few documents that Dr. Steer cites as evidence do not even support his opinion. To set a baseline to show his improved talk time, Dr. Steer claims that



. (Steer Opening Rpt., ¶ 111, pp. 47-48, Gardner Ex. 19.) But the document actually says that

(QCPV009981961 at QCPV009982016 (emphasis added), Gardner Ex. 69; Williams Reb. Rpt., p. 117, ¶ 212, ¶ 220, Williams Ex. B (

5

███████████████████████).)  Dr. Steer provides no analysis of the two chips' respective contributions to the ██████████.  Without analyzing the talk current of the RTR6250 alone, Dr. Steer can offer no reliable conclusion about any improvement resulting from ParkerVision's two patents-in-suit.

Then, without explanation, Dr. Steer ignores the Qualcomm product that allegedly first started using ParkerVision's patents (████████████), and arbitrarily jumps to the talk current of a later accused product, ████████████.  (Steer Opening Rpt., ¶ 111.)  Dr. Steer says that because █████████████████████████████████████████████████████ (Steer Opening Rpt., ¶ 111.)  He skips ████████ (accused of using ParkerVision's patents), because ████████████████████████████████████████████████████████.  (Williams Reb. Rpt., ¶ 222, ¶ 220, pp. 115-117.)  Using the one arbitrarily chosen comparison, Dr. Steer leaps to the unsupported conclusion that "one can safely conclude that at least 15 minutes of talk time (and likely much more) is attributable to ParkerVision's transmitter technology."  (Steer Opening Rpt., ¶ 111.)  But Dr. Steer never addresses how the asserted claims and accused functionality resulted in this talk current improvement or additional "talk time."  *Hudgens v. Bell Helicopters*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("expert's failure to explain the basis for an important inference mandates exclusion"); *Allison v. McGhan Med.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999) ("district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct

from being unscientific speculation" offered by an expert).   Dr. Steer never addresses whether other changes ███████████████, rather than the use of ParkerVision's alleged inventions, caused the improvement—a fatal omission because the first Qualcomm product that allegedly used the ParkerVision inventions (████) had *worse* talk current than its predecessors. *MicroStrategy v. Bus. Objects*, 429 F.3d 1344, 1355 (Fed. Cir. 2005) ("expert still must consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court"); Williams Reb. Rpt., ¶¶ 222-231, 235 (technical improvements and added features that have nothing to do with the patents-in-suit).   If ParkerVision's inventions were responsible for improved talk current, then why did the talk current worsen from prior designs when Qualcomm first allegedly incorporated those inventions? In short, Dr. Steer's citation—and misreading—of a few cherry-picked documents are not "sufficient facts or data" on which to base a highly technical conclusion.   Dr. Steer's opinion, and Mr. Bone's reliance on it, should be excluded.

*Second*, Dr. Steer's conjecture is not the "product of reliable principles and methods," and he has not "reliably applied the principles and methods to the facts of the case."   He never tested any of the accused products, he never simulated operation of the chips with and without the accused functionality (after controlling for all other conditions, including type of phone, network speed, carrier, etc.), and he never showed that the alleged "15 minutes" of additional talk time is tied specifically to the ParkerVision patents-in-suit or the accused functionality. (*Cf.* Bone Depo. 199:5-19, Gardner Ex. 33.)   Dr. Steer never cites any peer-reviewed

7

publications supporting his assumptions, methodology, or conclusions. Even school children know that a science experiment requires a control group and testing, to minimize the effects of other variables.

While Dr. Steer's opinion regarding ████████████████████ is unreliable and insufficient, his opinion and bases regarding the other accused products are non-existent.  ParkerVision accuses numerous dies beyond████

████████████████████████████████████████████████

████████████████████████████████████████████████

████.  Dr. Steer cites no evidence that any conclusions drawn about████████

████ apply to any of the other accused products—let alone all of them.  Dr. Steer (and Mr. Bone) simply assume the "15 minutes" applies across all accused products equally and that the extra "15 minutes" are attributable to the ParkerVision patents. *Power Integrations v. Fairchild Semiconductor*, 711 F.3d 1348, 1374 (Fed. Cir. 2013) ("layered assumptions lack the hallmarks of genuinely useful expert testimony").

Because Dr. Steer's testimony fails *Daubert*, ParkerVision should not be permitted to discuss the 15 minutes or make claims that ParkerVision's technology enabled Qualcomm to achieve additional "talk time" (or power or current savings). Dr. Steer's opinion should be excluded.  As Mr. Bone simply relies on Dr. Steer's unreliable opinion, Mr. Bone's damages opinions fall also.

### 2. Prohibiting Mr. Bone's Opinion on the Value of the 15 Minutes

The second assumption underlying Bone's staggering ████████████ damages

opinion is that Qualcomm would have paid a ███████████ for the supposed extra 15 minutes.  But Mr. Bone's opinion on the value of extra talk time fares no better than Dr. Steer's opinion.  Mr. Bone's ██████ is not based on an accused product, is not tethered to the accused functionality, and is based on an unaccepted proposal by a third party.

*First*, Mr. Bone relies entirely on a single "requested" pricing reduction by a third-party customer, not Qualcomm, to support his ████████.  (Bone Rpt., ¶ 497, Gardner Ex. 24.)   Specifically, a customer (████) said there was ████ ████████████████████████████████████████.  (*Compare* Bone Rpt., ¶ 497 (RFR6185) *with* p. 53 (Fig. 10); QCPV007605674 at QCPV007605690, Gardner Ex. 70.)   Qualcomm ███████████████ ████████████████████████████████████ ███████████████, Gardner Ex. 33.)  Thus, Bone based his ████ royalty on an unaccepted proposal for a product not even accused of infringement. *Whitserve v. Comput. Packages*, 694 F.3d 10, 29 (Fed. Cir. 2012) (patentee's expert erroneously relied on a proposed, unaccepted rate).  Bone's opinion not only fails *Daubert,* but is wholly irrelevant to the damages analysis.  Fed. R. Evid. 401, 702.

*Second*, Mr. Bone repeats the same errors as Dr. Steer.  Mr. Bone's ████ opinion is not based on "sufficient facts or data."  Fed. R. Evid. 702.[4]  The ████ *proposal* from a third party is tied neither to the accused products nor to the accused

---

[4] Even if Mr. Bone ████████████, his opinion suffers from the same problems discussed above, including that the discount is not tethered to the accused functionality or patents-in-suit.

functionality. Similarly, the ██████ is not the "product of reliable principles and methods." *Id*. ParkerVision's experts never explain why a handset manufacturer's alleged valuation of "power consumption" for a non-accused product is relevant to what Qualcomm, a chipmaker, would have agreed to pay for a license to two ParkerVision patents. *Omega Patents v. Calamp*, No. 13-1950, 2015 WL 12830496, at *11 (M.D. Fla. Dec. 23, 2015) (granting *Daubert*; stating "it is unclear to the Court what, if any, economic similarities these companies share"); *Hudgens*, 328 F.3d at 1344 ("failure to explain the basis for an important inference mandates exclusion"). Mr. Bone cites no evidence that Qualcomm would have valued 15 minutes at ██████, or Qualcomm would have valued the ParkerVision patents or accused functionality ██████. Nor is there evidence tying the discount Qualcomm gave ██████ to any particular technology or power savings. That ████████████████ ██████████ for a non-accused product is not a sufficient basis for the opinion.

The Court should strike and exclude ParkerVision from testifying about the "15 minutes," ████████████," and alleged "power consumption savings."

**B.     Damages Motion #2: Motion to Exclude Unsupported 4G LTE Multimode Chip and SAW Filter Opinions**

The Federal Rules require experts to disclose in their reports the "facts" and the "basis and reasons" for all opinions. Fed. R. Civ. P. 26(a)(2)(B), 37(c); *Moore v. GNC, Holdings*, No. 12-61703, 2014 WL 12684287, at *4 (S.D. Fla. Jan. 24, 2014) (excluding testimony where report failed to cite "details that would allow one to refer to the relevant studies, research, or sources" to "test, affirm, or rebut"

10

assertions).   "Exclusion is required" when the links underlying an opinion are "written in invisible ink."  *Open Text v. Box*, No. 13-4910, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015).[5]

Mr. Bone opines that Qualcomm should pay ██████████ ████████████ for the two "RX" patents.  Mr. Bone again relies on Dr. Steer to help him arrive at ████████████.   Mr. Bone's proposed ██████████ results from adding (1) an alleged █████ for a "price premium" for LTE chips—all of which Mr. Bone says Qualcomm would have agreed to give to ParkerVision;[6] and (2) █████ for alleged "cost savings."  (Bone Rpt., ¶¶ 575, 616, 619, Fig. 72, Gardner Ex. 24.)  Mr. Bone's calculated "cost savings" is based on (1) alleged cost savings by Qualcomm's *customers* █████ plus (2) cost savings allegedly "realized" by Qualcomm █████.  (Bone Rpt., Ex. 6.)  Mr. Bone then arbitrarily selects █████ ███████████████████████████████████████.  (Bone Rpt., ¶ 616, Gardner Ex. 24.)  Mr. Bone's opinion is unsupported by evidence, is not the result of a reliable methodology, and lacks the analysis necessary to substantiate a royalty that would exceed the total licensing revenue ParkerVision received from its entire portfolio by ██████████████.  Exclusion is required.

---

[5] *Clark v. Takata*, 192 F.3d 750, 759 n.5 (7th Cir. 1999) (even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable").

[6] Mr. Bone's $███ "price premium" is what Mr. Bone assumes Qualcomm acquired as an average "price premium" for "4G LTE multimode RF chips."  (Bone Rpt., ¶¶ 491, 490.)

### 1.    Striking Conjecture Regarding 4G LTE Multimode Chips

Just as in *ParkerVision I*, ParkerVision wishes to tell the jury that it would be "impossible" for Qualcomm to develop a 4G LTE multimode chip without ParkerVision's patents.[7]  Mr. Bone relies on this assumption to inflate his royalty by ▮▮▮▮▮▮.  But the entirety of ParkerVision's technical analysis for this idea is confined to a handful of paragraphs spanning less than a page of the report.  (RX Opening Rpt., pp. 216-217, Gardner Ex. 8.)   These paragraphs cite no facts, no data, no documents, and no recognizable or testable methodology.  *NetFuel v. Cisco*, No. 18-2352, 2020 WL 1274985, at *7-8 (N.D. Cal. Mar. 17, 2020) (expert must follow a discernable methodology, cannot be a "black box," which would render cross-examination futile).   ParkerVision's expert assumes because *he* is "not aware" of a multi-mode RF chip that practices 4G LTE that "does not make use of ParkerVision's down-conversion patents," *Qualcomm* could not have had an acceptable chip without ParkerVision.  (RX Opening Rpt., ¶ 653, Gardner Ex. 8.)[8]

ParkerVision's expert cites no evidence for concluding that ParkerVision's patents have anything to do with LTE.   (*Cf.* 1/29/21 Steer Depo. 346:6-10 ("nothing in the patent that talks about LTE"), Gardner Ex. 45.)  He cites no LTE specifications—*i.e.*, no standards—showing how or why the patents-in-suit read on

---

[7] *E.g.*, PV1 Benoit Rpt., ¶¶ 209, 120, 125, 195, 198-200, Gardner Ex. 25.
[8] ParkerVision never participated in any LTE standard organization.  (Williams Reb. Rpt., ¶ 27, ¶¶ 22-26, ¶ 14, Williams Ex. B.)  Nor did ParkerVision declare any of its patents essential to any LTE standard.  (12/4/2020 Sorrells Depo. 165:8-14, Gardner Ex. 41.)  ParkerVision never even produced a LTE chip.  (12/4/2020 Sorrells Depo. 164:1-3, Gardner Ex. 41; Williams Reb. Rpt., ¶ 259 (not down-convert LTE signals), Williams Ex. B.)

LTE.  *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (opinion excluded where the "basis" for the opinion was unclear and difficult for the court to "verify").  He wishes for the jury to "take his word" that without ParkerVision, Qualcomm could not produce a 4G LTE multimode chip.  This is classic *ipse dixit*.

Additionally, the Eleventh Circuit has warned that "[t]emporal proximity is generally not a reliable indicator of a causal relationship."  *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1254 (11th Cir. 2010); *McClain v. Metabolife Int'l*, 401 F.3d 1233, 1243 (11th Cir. 2005) ("The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence.").  ███████████████████████████

███████████████.  Because that timing overlaps with the timing of the accused products, ParkerVision wishes to confuse the jury into believing that ParkerVision *caused* Qualcomm to develop LTE chips.  But such bold assertions cannot be admitted without support.  Because ParkerVision's expert cites none, the opinion is inadmissible.[9]  The Court should exclude ParkerVision's 4G LTE multimode chip opinions.[10]

### 2. Striking Arbitrary SAW Filter Counting

On pages 228-230 (table), ParkerVision's RX expert magically arrives at arbitrary figures for the number of ████████████████████████████

---

[9] Qualcomm, in fact, achieved "performance specifications comparable to the LTE signal path specifications" in products undisputedly not accused of infringing the patents-in-suit and launched *before* the first accused RX products.  (Williams Reb. Rpt., pp. 163-166, Williams Ex B.)

[10] RX Opening Rpt., pp. 216-217, and all relevant sections of Mr. Bone's report, including pp. 240-247, 252, 256, 261, 263, should be stricken.

13

████████ allegedly "Eliminated" due to ParkerVision.  (RX Opening Rpt., pp. 228-230, Gardner Ex. 9.)    There are no footnotes, no pin-cites, and no documents cited for each number.  *Lyons v. Leatt*, 322 F.R.D. 327, 334-46 (N.D. Ind. 2017) (striking testimony where report failed to "connect the dots" and cite the evidence used).  Nowhere does he identify (1) which page of which diagram of which version of which part he looked at to count the ████████, (2) which configurations he looked at, (3) what methodology he used to arrive at the totals (which inputs he counted or discarded), (4) which specific SAW filters he believed were "eliminated," (5) which SAW filters he dubbed to be ████████ ████████ and (6) why he thought those SAW filters were eliminated due to ParkerVision.  His analysis is a "black box," which enables neither this Court nor Defendants to do an "independent analysis" to test whether his methodology is consistent or sound.  *Lee-Bolton v. Koppers*, 319 F.R.D. 346, 377-78 (N.D. Fla. 2017) (method suffering from "the impermissible 'black box' syndrome" where the court cannot do an "independent analysis" of each step is inadmissible); *Moore*, 2014 WL 12684287, at *4 (report failed to cite "details that would allow one to refer to the relevant studies, research, or sources" to "test, affirm, or rebut" assertions). The SAW filter counting he did is "junk science" written in "invisible ink."

Because ParkerVision's expert did such a bad job citing documents and explaining his methodology in his report, he confessed that he did "not know where he obtained that information," found "mistake" upon "mistake," and could not specify which documents he relied upon, including based on alleged privilege

14

claims. (1/29/21 Steer Depo. 390:12-20, 403:16-20, 410:23-411:18, 414:1-9, Gardner Ex. 45.)[11]  One glaring example of his flawed opinion is the ███████ ██████████████. But he concluded that ParkerVision allowed the elimination of GSM SAW filters from that device. (1/29/21 Steer Depo. 407:9-408:23, 410:16-411:4, Gardner Ex. 45; RX Opening Rpt., p. 229.) Because he cited no documents for his conclusion on the ███████████████, he was left to assume, guess, and speculate as to whether any support at all exists for the conclusion. (1/29/21 Steer Depo. 388:20-389:2 ("I suspect he used"), 392:9-15 ("I assume that he looked at"), 392:17-21 ("I have to guess"), 404:4-22 ("I suspect that he relied on").)  Neither this Court nor Defendants can reproduce what he did.

Experts must disclose "the facts or data considered" and the "basis and reasons" for each opinion. Fed. R. Civ. P. 26(a)(2)(B), 37(c).  ParkerVision's expert violated the rules, compounding the problem by making unreliable guesses about SAW filters.  ParkerVision wants the jury to just trust their expert's table, while robbing Defendants of the ability to decipher where and how he got his numbers.

---

[11] During deposition, ParkerVision's replacement expert speculated about relying on uncited appendices. *Moore*, 2014 WL 12684287, at *4 (belated deposition testimony did not cure failure to disclose in report).  But he could not possibly be relying on these generic appendices because Appendix D is missing products ██████████████████  Appendix E is simply a reproduction of every page printed by ParkerVision (no annotations, no analysis), and Appendix F is silent about damages or SAW filters (laundry list of bates ranges relating to "infringement"). Appendix D and F are also filled with voluminous citations to types of documents ███████ ████████████████ that, during deposition, he was "suspicious" about and claimed could not be used to accurately determine the number of supported PRx inputs or GSM support. (*E.g.*, 1/29/21 Steer Depo. 471:25-472:3.) He also mentioned reviewing an interrogatory response, but could not identify it and none were cited.  Since no support is cited in his table, neither Defendants nor this Court are able to test how he arrived at each SAW filter number.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  This is improper.

ParkerVision's claim that its technology resulted in the elimination of SAW filters suffers from another insurmountable hurdle.  ParkerVision's experts admit that "a lot of technologies" contributed to the elimination of SAW filters, not just ParkerVision's patents.  (PV RX Depo. 177:11-14, Gardner Ex. 27 ("Q.  So there is a lot of technologies that contribute to the elimination of SAW filters; correct? A.  Yes, that's correct."); PV RX Depo. 129:11-16, Gardner Ex. 27; Bone Depo. 183:17-20, Gardner Ex. 33.)  As a result, ParkerVision and its experts had to address which technology allowed the elimination of each SAW filter—not just assume it was all because of ParkerVision.  *Virnetx v. Cisco Sys.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("patentee must take care to seek only those damages attributable to the infringing features"); *Power Integrations v. Fairchild Semiconductor Int'l*, 904 F.3d 965, 977 (Fed. Cir. 2018) (apportion).  Indeed, the Eleventh Circuit has made clear that an "expert must provide reasons for rejecting alternative hypotheses using scientific methods," and the "elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation."  *Chapman*, 766 F.3d at 1310.  A differential analysis "must at least consider other factors" that could have been the cause.  *Guinn v. AstraZeneca Pharms.*, 602 F.3d 1245, 1253-56 (11th Cir. 2010); *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999) (courtroom should have the same level of intellectual rigor as field).

During discovery, Qualcomm identified three dozen technologies that it added to the accused products, including ████████████████████████

16

██████████████████████████████████████████████████████

█████████████████████. (QC Rog. No. 10 Resp. at 37-40, 52, 5-184, Gardner Exs. 58-59; Williams Reb. Rpt., ¶¶ 265-291, Williams Ex. B.)  ParkerVision's technical expert "did not analyze those technologies," and admitted that he "can't" distinguish between how those technologies, as opposed to "ParkerVision's technology," impacted Qualcomm's ability to eliminate SAW filters.  (PV RX Depo. 137:25-138:6, 143:23-144:5, 178:25-179:5, 132:2-12, Gardner Ex. 27); *MicroStrategy v. Bus. Objects*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005) (testimony excluded where expert did not account for other factors).  ParkerVision's expert simply credits "all" of the LTE SAW filters allegedly eliminated in Qualcomm's products to "ParkerVision's technology."   (PV RX Depo. 177:15-18, Gardner Ex. 27 ("Q.  And for all the LTE SAW filters that were eliminated in Qualcomm's devices, you credited all of that to ParkerVision's technology; correct?  A.  Yes.").)  He cites no facts, no data, and no scientific methodology.  ParkerVision's expert provides no reasons for rejecting all the other technologies that undisputedly contributed to the elimination of SAW filters.  (*Cf.* Williams Reb. Rpt., ¶¶ 265-291, Williams Ex. B; PV RX Depo. 137:25-138:6, 177:11-14, Gardner Ex. 27.)  He assumed that SAW filters missing were attributable to ParkerVision without addressing the "lot of technologies" that were undisputedly relevant.

17

The Court should preclude ParkerVision from discussing the allegedly "eliminated" SAW filters.[12]

**C.**   **Damages Motion #3**:  Motion to Exclude Mr. Bone's RX Opinions

**1.**   **Mr. Bone Inflates His Rate Using a "Price Premium"**

Mr. Bone inflates his royalty rate by assuming that differences between what Qualcomm charged for high-end LTE chips and non-LTE chips should go to ParkerVision.   (Bone Rpt., ¶ 575 (claiming ParkerVision would receive the "entire ████, ¶¶ 491, 483, Gardner Ex. 24; Motion #2(1) above.)  This opinion is not tethered to any facts.  He cites no evidence that Qualcomm's pricing for high-end LTE chips has anything to do with the accused functionality or patents-in-suit, that his comparison is methodologically sound, or that he has appropriately apportioned for other reasons why Qualcomm's chips may be priced differently. He offers no basis for concluding that ParkerVision—a company that has recovered less than ████ in license royalties and never produced an RF chip that supports an LTE modem—would have commanded Qualcomm's LTE "price premium."  (Williams Reb. Rpt., ¶ 225, Williams Ex. B.)

**2.**   **Mr. Bone Impermissibly Taxes Qualcomm for Speculative Alleged "Cost Savings" of Qualcomm's Customers**

As demonstrated above, the entire basis for the alleged "cost savings" from the elimination of SAW filters is speculative.  But Mr. Bone makes the problem

---

[12] RX Opening Rpt., ¶¶ 657-682, and all relevant sections of Mr. Bone's report, including pp. 181-191, 211, 230-236, 247, 252-254, 257-261, 263, Exs. 6-6.2.2, 24, should be stricken.

worse by then using the unsupported SAW filter counting to calculate an alleged "cost savings to" *Qualcomm's customers*.  (Bone Rpt., ¶ 463, Gardner Ex. 24; Bone Depo. 176:19-23, Gardner Ex. 33 ("that's a savings to the customer, not to Qualcomm").)  But this methodology for determining damages has at least two fundamental flaws.  *First*, ParkerVision has no proof the customers saved the SAW filters counted.  Mr. Bone *assumes* that a SAW filter was needed on *every* possible input, that *every* customer used *every* input, and that the customer chose not to use a SAW filter on *every* input.  ParkerVision's expert



. (1/29/21 Steer Depo. 421:23-422:15 (

), Gardner Ex. 45.)  Moreover,

. (*E.g.*, QCPVII00050565 at QCPVI100050642-44, Gardner Ex. 68.)[13]  *Second*, Mr. Bone, without basis, taxes Qualcomm with all customer costs, proclaiming they should be awarded to ParkerVision.  His opinion is untethered to the facts and unsupported by evidence, rendering it inadmissible.

### D. <u>Damages Motion #4</u>:  Motion to Strike ParkerVision's Reliance on the Failed 1998-99 Negotiations

This Court in *ParkerVision I* precluded ParkerVision's damages expert under *Daubert* from "relying on the 1999 Documents and negotiations." *ParkerVision v. Qualcomm*, No. 11-719, 2013 WL 12152672, at *5 (M.D. Fla. Oct. 11, 2013).

---

[13] ParkerVision cannot claim that that it did not take credit for ▮▮▮▮▮▮ given its failure to cite to any documents or identify which specific inputs benefited from the alleged SAW filter elimination.  (*See* Motion #2(2).)  Defendants and the Court have no way to verify if this is true.

The Court held that "there can be little dispute that the 1999 documents and negotiations are *too different* from the hypothetical negotiation to provide a reliable foundation for [ParkerVision's expert's] economic analysis." *Id.* at *5 (emphasis added). There were "radical differences between the hypothetical negotiation and the 1999 negotiations, as well as the vast temporal chasm." *Id.* at *4. It was undisputed that "between 1999 and 2006, there were seismic changes in the marketplace for wireless receivers, transceivers, and baseband chips." *Id.* Both sides' "business models" had "changed." *Id.* Qualcomm had "noninfringing alternatives." *Id.* The Court further held that "opinions based on Qualcomm's internal financial projections created seven years before the hypothetical negotiation are *too speculative and unreliable* to be helpful to the jury." *Id.* at *5 (emphasis added). The fact that the negotiations were unsuccessful (*i.e.*, no signed agreement) "counsel[ed] against use of the evidence." *Id.* at *5 n.5. The Court precluded ParkerVision's expert from relying on the negotiations. *Id.*

So too here. This Court should preclude ParkerVision's damages expert, Mr. Bone, from relying on the 1998-99 documents and negotiations.[14]

The *Whitserve* decision is instructive. The Federal Circuit vacated an $8.3 million award, where the patentee's expert had relied upon a rate in a "*proposed, but unaccepted, license.*" *Whitserve*, 694 F.3d at 29; *Deere & Co. v. Int'l Harvester Co.*,

---

[14] All relevant sections of Mr. Bone's report should be stricken, including paragraphs 148-225, 275, 279, 281, 315, 354, 405-407, 420, 437-438, 472, 514-565, 578, 588-590, 593, 594, 596, 605-610, Exs. 2, 3.1, 3.2, 4, 4.1, 4.2, 4.3, 4.4, 4.4.1, 4.4.1.1, 29.1, 29.2, 29.3, and 29.4.

710 F.2d 1551, 1558 (Fed. Cir. 1983) ("offer" to license had "little or no probative value"); *Prisua Eng'g v. Samsung Elecs.*, No. 16-21761, 2018 U.S. Dist. LEXIS 221548, at *9 (S.D. Fla. Feb. 13, 2018) (mere declined proposal).  In the context of signed agreements, the Federal Circuit has rejected patentees' reliance on "radically different" agreements.  *Uniloc USA v. Microsoft*, 632 F.3d 1292, 1316 (Fed. Cir. 2011); *Lucent*, 580 F.3d at 1327-32; *Wordtech Sys. v. Integrated Networks Sols.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010); *ResQNet.com v. Lansa*, 594 F.3d 860, 870 (Fed. Cir. 2010) (expert erroneously relied on "re-bundling licenses").

     1.    **The 1998-99 Negotiations Were For "Know-How" and A Potential Technology Transfer, Not Just For a Bare Patent License For the Four Patents-in-Suit**

In the 1998-99 timeframe, ParkerVision approached Qualcomm about a potential technology transfer.  None of the four patents in this case existed.[15,16]

The discussions concerned more than just patents.  The discussions concerned ParkerVision's plan to provide Qualcomm with, among other things, know-how, trade secrets, and technical assistance for 1998-99 era products. (QCPV001390354; QCPV010492373 at QCPV010492378 (Ex. A); Bone Rpt., ¶ 530 ("more than a naked patent license").)  Mr. Bone's report uses figures from a proposed offer with over ten pages of conditions to create a

---

[15] The '940 patent issued in July 2000, the '372 patent issued in 2006, the '907 patent issued in 2007, and the '177 patent issued in 2011.  (Williams Opening Rpt., p. 5, Williams Ex. A.)

[16] In *ParkerVision I*, ParkerVision claimed the 1998-99 discussions concerned the patents litigated in *ParkerVision I*.  In ParkerVision's Jacksonville case, ParkerVision claimed the 1998-99 discussions concerned the patents litigated in Jacksonville.

"partnership agreement." (QCPV001389883 at QCPV001389884-QCPV001389894, Gardner Ex. 73; Bone Rpt., ¶ 533 & n.1023.) For example, the offer included . (QCPV001389883 at QCPV001389884-894, Gardner Ex. 73.)

. (QCPV010492373 at QCPV010492378.)

. (QCPV001556376; QCPV001556329, QCPV001556330, Gardner Exs. 75.)

ParkerVision's ideas were eventually "dismissed" as a "sham," when ParkerVision could not even deliver a working test board. (Williams Opening Rpt., ¶ 51, Williams Ex. A.) The parties went their separate ways.

   **2. Mr. Bone Admits There Were At Least Ten Key Differences Rendering the 1998-99 Discussions Non-Comparable, And Supplies No Facts or Data That Could Allow the Jury to Economically Account for Those Fundamental Differences**

Here, just as in *ParkerVision I*, ParkerVision alleges that the hypothetical negotiation would have occurred in 2006. (Bone Rpt., ¶ 279, Gardner Ex. 24; *ParkerVision I*, 2013 WL 12152672, at *4. Mr. Bone's report admits there were at least ten key differences between the 1998-99 discussions and the 2006 hypothetical negotiation, including (1) "Six-year temporal gap," (2) "Advancements in

technology during that 6-year period," (3) "Changes in Qualcomm's business over that 6-year period," (4) "Qualcomm's projections would have been different," (5) "Qualcomm's profitability would have been different," (6) "Transmitter (up-conversion) technology would have also been considered," (7) "Patent applications v. issued patents," (8) "Assumptions of validity and infringement," (9) "Availability of acceptable non-infringing alternatives," and (10) "Substance of what Qualcomm would have received." (Bone Rpt., pp. 214-219, Gardner Ex. 24.) These differences render Mr. Bone's reliance on the 1998-99 discussions—which were for a broader technology transfer and additional rights and conditions—fundamentally unreliable and inadmissible under Federal Circuit precedent. Even if Mr. Bone could rely on a non-comparable, unexecuted offer (which would be contrary to precedent), Mr. Bone supplies no facts that could allow a jury to economically account for these fundamental differences between the 1998-99 discussions and the hypothetical negotiation.   Allowing Mr. Bone's opinions would only invite reversal.  *Lucent*, 580 F.3d at 1308 (vacating damages).[17]

### 3.    Mr. Bone's Reliance on Cherry-Picked Internal Emails to Artificially Inflate Damages is Not A Reliable Methodology

No Federal Circuit decision has endorsed reliance on internal emails speculating about proposed rates for a broader technology transfer as a basis for

---

[17] ParkerVision may try to falsely claim that Qualcomm also relied on the 1998-99 discussions. Qualcomm's expert, Ms. Mulhern, was *rebutting* Mr. Bone's damages opinions.  Ms. Mulhern's discussion is focused on illustrating ███████████. (Mulhern Depo, p. 34, Gardner Ex. 49.)  Ms. Mulhern also cites other evidence for these points and her damages number does not rely on 1998-99 discussions.

calculating damages of specific patents that had not issued.  This Court should not permit Mr. Bone to base his damages opinion on cherry-picked emails from years before the hypothetical negotiation or even the patents' existence.  For example, Mr. Bone uses random emails with ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████ which never happened.

None of the cited emails or drafts are about the accused products, patents-in-suit, or accused functionality. *Virnetx*, 767 F.3d at 1334 (vacating award where damages theory was "insufficiently tied to the facts of the case"); *Power Integrations*, 711 F.3d at 1375 (patentee's expert erroneously relied on speculative hearsay). Mr. Bone provides no "facts or data" to support his assumptions that a "cost savings" and percentages discussed internally amidst failed discussions in 1998-99 would be the same at the hypothetical negotiation several years later in 2006. Reasonable royalty opinions based on these discussions, that never resulted in an executed agreement and did not account for numerous intervening events, are

---

[18] QCPV001547450; Bone Rpt., ¶ 534 & n.1025; Bone Rpt., Ex. 3.1 (line [2]); Bone Rpt., ¶ 605 & n.1122; QCPV001562166, Gardner Ex. 77; Bone Rpt., Ex. 3.1. ██████████████████████ ██████████████████████████████████████████████████████████████.

[19] Bone Rpt., Ex. 3.2 (line [1] (citing QCPV001413479)); QCPV001413479, Gardner Ex. 78.
[20] Bone Rpt., Ex. 3.2; Bone Rpt., ¶ 549; QCPV001413479 at QCPV001413479-80, Gardner Ex. 78.

too speculative and unreliable to be helpful to a jury.  Fed. R. Evid. 702.

    **4.**    **Mr. Bone's Analysis is Fundamentally Flawed Because It Does Not Account for Vast Differences, Which Render the 1998-99 Discussions Unreliable and Irrelevant**

Damages evidence "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations." *Uniloc*, 632 F.3d at 1318.  Mr. Bone's analysis is fundamentally unreliable, because it ignores obvious differences in bargaining positions between ParkerVision and Qualcomm in 1999 and 2006, and assumes without basis that internal cost savings proposed in the context of failed 1998-99 discussions would be the same in 2006.  Between 1999 and 2006, there were undisputedly shifts in technology and alternatives available to Qualcomm, including successful non-infringing direct downconversion products.  (Williams Reb. Rpt., ¶¶ 124-129 (ZIF), ¶ 136 (50% duty cycle), Williams Ex. B.)  Those products are not accused, because they undisputedly do not infringe.  (Williams Reb. Rpt., ¶ 125; *id*. at ¶¶ 101-102, 115-118 (Qualcomm and others were responsible for numerous technological developments unrelated to the accused features).)  In other words, as the Court noted in *ParkerVision I* and as Mr. Bone must concede, Qualcomm was in a different place technologically and economically speaking in 2006 than it was six or seven years earlier.  (Bone Rpt., pp. 214-219; Williams Reb. Rpt., ¶ 136.)  The situations in 1998-99 and 2006 are too radically different to support a reasonable royalty.  *Lucent*, 580 F.3d at 1327.

 Dated:  February 16, 2021                */s/ Matthew J. Brigham*

BEDELL, DITTMAR, DEVAULT,
PILLANS & COXE, P.A.
John A. DeVault, III
Florida Bar No. 103979
jad@bedellfirm.com
Michael E. Lockamy
Florida Bar No. 069626
mel@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Phone: (904) 353-0211
Fax: (904) 353-9307

CADWALADER, WICKERSHAM
& TAFT, LLP
Howard Wizenfeld (pro hac vice)
Howard.wizenfeld@cwt.com
One World Financial Center
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6050
Facsimile: (212) 504-6666

COOLEY LLP
Stephen C. Neal (pro hac vice)
nealsc@cooley.com
Matthew J. Brigham (pro hac vice)
mbrigham@cooley.com
Jeffrey Karr (pro hac vice)
jkarr@cooley.com
Priya Viswanath (pro hac vice)
pviswanath@cooley.com
Dena Chen (pro hac vice)
dchen@cooley.com
Sarah B. Moore (pro hac vice)
smoore@cooley.com
Patrick W. Lauppe (pro hac vice)
plauppe@cooley.com
3175 Hanover Street
Palo Alto, CA  94306-2155
Phone:  (650) 843-5000
Fax:  (650) 849-7400

COOLEY LLP
Stephen Smith (pro hac vice)
ssmith@cooley.com
1299 Pennsylvania Avenue NW,
Suite 700
Washington, DC 20004
Phone:  (202) 842-7800
Fax:  (202) 842-7899

COOLEY LLP
Eamonn Gardner (pro hac vice)
egardner@cooley.com
380 Interlocken Crescent, Suite 900
Broomfield, CO 80021-8023
Telephone: (720) 566-4000
Facsimile: (720) 566-4099

*Attorneys for Defendants Qualcomm
Incorporated and Qualcomm Atheros, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and forgoing document has been served on all counsel of record via the Court's ECF system on February 16, 2021.

*/s/ Matthew J. Brigham*
COOLEY LLP
Matthew J. Brigham (pro hac vice)
mbrigham@cooley.com
3175 Hanover Street
Palo Alto, CA  94306-2155
Phone:  (650) 843-5000
Fax:  (650) 849-7400

*Attorney for Defendants Qualcomm Incorporated and Qualcomm Atheros, Inc.*

27