## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PARKERVISION, INC.,

                        Plaintiff,

v.

QUALCOMM INCORPORATED and
QUALCOMM ATHEROS, INC.,

                        Defendants.

Case No. 6:14-cv-687-PGB-LRH

## TIME-SENSITIVE MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.  LOCAL RULE 3.01(E) STATEMENT; INTRODUCTION

Pursuant to Local Rule 3.01(e), Qualcomm seeks assistance from the Court to remedy misconduct by plaintiff ParkerVision, which is jeopardizing Qualcomm's constitutional right to a fair trial. ParkerVision recently launched a widespread disinformation media campaign entitled "Against the Giants," which contains numerous false and misleading statements about the outcome of the prior lawsuit presided over by this Court, the facts of this case, and Qualcomm. ParkerVision's highly inflammatory pretrial publicity is—by its own admission—an overt attempt to sway the jury pool in the upcoming trial: "Our goal is to . . . shed light on the facts of our case . . . [which] will provide valuable insight for … *the broader public as we hope to schedule a trial in 2025.*" This media campaign—comprised of a press release

1

2861680

by ParkerVision, a self-produced documentary-style video, and multiple interviews—has been disseminated and publicized through various media outlets, including: ParkerVision's own website; social media platforms such as YouTube, Instagram, and X; The Glenn Beck Program podcast (with an estimated 8.7 million weekly listeners, including listeners in Orlando via WFLA Newsradio Orlando); the One America News Network ("OANN"); the online news medium, The Blaze; and ACCESS Newswire. ParkerVision's statements have been published widely via the Internet as well as television news channels and radio stations in this District.

Absent immediate Court intervention, ParkerVision has promised to continue its campaign, including by releasing three more videos in its "Against the Giants" series. ParkerVision's media campaign carries the reasonable and substantial risk of influencing prospective jurors and compromises the integrity of this Court proceeding.

In its media campaign to-date, ParkerVision disparages the judicial process in the Middle District of Florida and maligns the fairness of the forum. Namely, ParkerVision impugns Judge Dalton's ruling in the prior *ParkerVision I* trial, falsely claiming that he improperly reversed the jury's verdict as a result of collusion between Qualcomm and the administration of then-President Obama (who appointed Judge Dalton). ParkerVision draws a direct connection between the *ParkerVision I* case and the instant case,

2

stating that ParkerVision "has filed a second lawsuit against Qualcomm and a judge has indicated he is ready to take it to trial," then suggesting that similar misconduct may be afoot by asking: "Why is it taking so long to get a trial in our second lawsuit?" Finally, ParkerVision baselessly accuses Qualcomm of conspiring with the Obama administration to "offshore" ParkerVision's technology to China and giving "America's pre-eminent adversary a competitive edge." ParkerVision's goal in falsely attacking Qualcomm and its workforce is clear: ParkerVision implores the public to "send a big fat message" to Qualcomm, apparently by way of this lawsuit.

Given the gravity of this matter and the significant risk of irreparably tainting the jury venire, and Qualcomm's need for immediate relief, Qualcomm respectfully files this motion on a time-sensitive basis to preserve its constitutional right to a fair trial. As set forth below and in Qualcomm's concurrently filed Proposed Order, Qualcomm respectfully requests that this Court order ParkerVision to immediately remove and/or cause to be removed the false and misleading public statements regarding this case; cease further misleading or disparaging public statements regarding the parties' dispute; and stop the release of ParkerVision's forthcoming "Against the Giants" videos. Per Rule 3.01(e), Qualcomm respectfully requests a ruling on this motion by <u>Wednesday, February 5, 2025</u> or as soon as possible.

3

2861680

## II. FACTUAL BACKGROUND

### A. ParkerVision Launched a Media Campaign to Try its Case to the Public

ParkerVision, including through its CEO Jeffrey Parker, has recently launched a digital media campaign aimed at swaying the public ahead of the upcoming trial in this action. This campaign has been promulgated across various online platforms and media outlets with significant viewership both locally and nationally, as described below.

#### 1. ParkerVision's Press Release

On January 30, 2025, at approximately 8:35 a.m. EST, ParkerVision posted a press release on its website, entitled "ParkerVision Launches 'Against the Giants' Video Series Highlighting Ongoing Litigation." Declaration of Anjali Srinivasan ("Srinivasan Decl."), Ex. A. This press release announces the release of the first in a four-part video series, with subsequent episodes scheduled for release in "coming weeks." Critically and most alarmingly, ParkerVision's press release expressly states that ParkerVision's intent is to use its "Against the Giants" campaign to influence the "broader public" ahead of the upcoming jury trial in the current proceedings. The press release reads as follows:

**ParkerVision Launches "Against the Giants" Video Series Highlighting Ongoing Litigation**

JACKSONVILLE, FL / ACCESS Newswire / January 30, 2025 / ParkerVision, Inc. ("the Company") (OTCQB:PRKR) announced today the

4

release of the first episode in its four-part video series, *Against the Giants*. The series, available exclusively on the newly created @Against_Giants X (formerly Twitter) and Instagram pages, provides an in-depth look into ParkerVision's ongoing legal battle against Qualcomm.

As part of its commitment to transparency, ParkerVision aims to inform stakeholders about the critical issues at the heart of the litigation and the broader implications for intellectual property rights and fair competition in the tech industry.

"Our goal with *Against the Giants* is to shed light on the facts of our case and offer a clear, compelling narrative that underscores the importance of protecting innovation," said Jeffrey Parker, CEO of ParkerVision. "***We believe this series will provide valuable insight for our investors, partners, and the broader public as we hope to schedule a trial in 2025***."

The first episode of *Against the Giants* is now live on . . . on X and Instagram, with subsequent episodes scheduled for release in the coming weeks.

For more information, follow @Against_Giants on X … and Instagram….

*Id.* (emphasis added).

ParkerVision's press release was distributed through ACCESS Newswire, and the story has since been picked up by at least eight media outlets, including OANN and The Glenn Beck Program. *See* Srinivasan Decl. ¶¶ 3(i)–3(xi).

## 2.  Multi-Part Video Series on Social Media

The same day as its press release, ParkerVision posted its first video, entitled, "Against the Giants — How Qualcomm Stole ParkerVision's Tech and Leveraged the Obama Admin." Srinivasan Decl., Exs. B, C. ParkerVision released the video on numerous newly created social media accounts, including on YouTube, Instagram, and X (formerly Twitter). ParkerVision's

5

video has since been reposted by social media influencers, including some accounts with several hundred thousand and even millions of followers (*id.* Exs. P, Q)—a higher follower count than many local news accounts, including the Orlando Sentinel and the Tampa Bay Times. *Id.* Exs. R, S. As of 12 p.m. PST on February 3, 2025 (approximately five days after it was posted), the video has been viewed over half a million times and re-tweeted over a thousand times on X alone. Srinivasan Decl. Ex. D.

The six-minute video is presented as a documentary and features all of the ParkerVision-affiliated fact witnesses that ParkerVision intends to call at trial: Jeffrey Parker (ParkerVision's CEO and founder), David Sorrells (ParkerVision's employee and inventor), and Greg Rawlins (ParkerVision's chief staff scientist). *See* Srinivasan Decl. Exs. B, C. Several statements and implications presented in the video are false, misleading, and/or inflammatory. To begin, ParkerVision insinuates that corruption drove Judge Dalton's decision to grant judgment as a matter of law to Qualcomm in *ParkerVision I.* Specifically, Mr. Parker claims that Judge Dalton's decision to "kill[] the case" was the politically-motivated result of collusion between the administration of then-President Obama (who appointed Judge Dalton) and Qualcomm. *See* Srinivasan Decl. Ex. B, at 2:04–3:25 (stating that just before the decision, President Obama attended a fundraiser at the home of Qualcomm's long-retired founder Irwin Jacobs, and around the same time a

6

computer geo-located in the White House viewed ParkerVision's website).

Next, ParkerVision's video baselessly accuses Qualcomm of stealing ParkerVision's technology and conspiring with the Obama administration to "ship[] off" ParkerVision's technology to China. Indeed, in an X post, ParkerVision summarized its video as telling "the untold story of how big tech giant Qualcomm ripped-off one of the most important patented innovations in American history [ParkerVision's] and shipped it off to China with the help from the U.S. government." Srinivasan Decl. Ex. D. Similarly, as ParkerVision employee David Sorrells elaborated in the video: "The 'China issue' is one thing. We expect them to steal it. But for the government to make it easier for our own companies to steal our own inventions, I think, is absolutely wrong." Srinivasan Decl. Ex. B at 3:46–3:58.

Finally, ParkerVision's video makes several statements specifically directed at potential jurors and this Court. Namely, ParkerVision states: "these people [Qualcomm] that . . . just care about their bottom line? That hacks me off. . . . *But maybe if you send a big fat message to some of these folks, maybe then they'll get the picture*." *Id.* at 4:37–4:54 (emphasis added). Likewise, Mr. Parker explicitly references the current proceedings and groundlessly suggests collusion may be at play, asking: "We're now going on our 11th year. *Why is it taking so long to get a trial in our second lawsuit?*" *Id.* at 5:22–5:30 (emphasis added).

7

### 3. Public Appearances on Large Media Platforms including Glenn Beck

Over the past few days, Mr. Parker has made public appearances on
The Glenn Beck Program and the One America News Network. *See*
Srinivasan Decl. Exs. E–K. Both interviews reiterate false and misleading
statements regarding Qualcomm, the Obama administration, and Chinese
theft of ParkerVision's technology—in addition to announcing a call to action
for the public, various politicians, the Trump Administration, and U.S.
Attorney General (and former Florida Attorney General) Pam Bondi.
ParkerVision subsequently reposted both interviews on its Against the
Giants YouTube channel. *Id.* Exs. F, J.

For example, during Mr. Parker's interview on The Glenn Beck
Program, Mr. Beck summarized Mr. Parker's false statements as follows:
"Qualcomm, according to him [gesturing across the table towards Parker] and
according to a jury, stole that technology, used that technology, gave that
technology over in China and never paid him. . . . ***Then after the jury
verdict came back . . . a few weeks later, after Obama met with
Qualcomm and you got the DOJ involved, suddenly the judge flips***."
Srinivasan Decl., Exs. F, G, at 17:04–17:34 (emphasis added). Later in the
same interview, Mr. Parker remarked that "you have a good right to be
worried if our large tech companies, 'Big Tech,' are willing to take these kinds

2861680

of intellectual property overseas and put them in China, India, Taiwan, where we have no control." *Id.* at 25:14–25:32. Just before thanking Mr. Parker and closing the segment, Mr. Beck turned to the camera and told his audience, "I want you to find this information. I want you to call your congressman, and we are going to make sure this gets in front of Pam Bondi and everybody else, because this is a really big deal." *Id.* at 29:12–29:25. Glenn Beck subsequently posted and shared ParkerVision's *Against the Giants* video to his X account, which has 2 million followers, while also tagging Attorney General Pam Bondi to investigate. Srinivasan Decl. Ex. P.

Likewise, on OANN, Mr. Parker is introduced as follows: "The CEO of ParkerVision, Jeff Parker, believes the Obama-era DOJ under Eric Holder may have helped Qualcomm avoid consequences." Srinivasan Decl. Ex. J, at 0:32–0:42. During their dialogue, Mr. Parker nodded in agreement multiple times as the host remarked, "this definitely raises serious questions about corruption, possible government collusion, Big Tech theft." *Id.* at 5:14–5:21. Mr. Parker then calls for the Trump administration to "look into . . . our situation" (*id.* at 7:22–7:26), while again indicating that "the judge has yet to set a trial date, he's told us he's ready to set a date . . . we're hoping it's going to happen real soon" (*id.* at 7:52–8:05).

Both The Glenn Beck Program and OANN command substantial viewership and spheres of influence, including in this District. The Glenn

9

Beck Program reaches an estimated 8.7 million weekly listeners, including

listeners in Orlando and the neighboring Tampa Bay area via WFLA

Newsradio. Srinivasan Decl. Exs. H, M. Mr. Beck also has over 2 million

social media followers on X alone. *Id.* Ex. P. Similarly, OANN is available to

all visitors on the web and as well as at least one television channel in this

District (Channel 55 in the Cocoa Beach area). *Id.* Exs. I, L.

## B. Qualcomm Attempts to Ameliorate the Prejudicial Impact of ParkerVision's Public Statements Without the Court's Intervention

Upon learning of ParkerVision's media campaign, Qualcomm's counsel

promptly served a cease-and-desist letter on ParkerVision's counsel at

McKool Smith on January 31, 2025, requesting that ParkerVision's videos

and press release be taken down. Srinivasan Decl., Ex. N. On February 3,

Qualcomm's counsel met and conferred with ParkerVision's counsel at

McKool Smith. *Id.* ¶ 7. ParkerVision's counsel could not agree to Qualcomm's

requests nor could they provide any interim assurances—for example, they

could not confirm that ParkerVision would not release additional videos (or

make additional media appearances)—while the parties worked to resolve the

dispute. ParkerVision's counsel suggested they may have more information

late the following day, Tuesday, February 4 or early Wednesday, February 5.

*Id.* The parties' counsel exchanged more emails, and Qualcomm explained

that given the lack of urgent action, it would have no choice but to seek

10

2861680

emergency relief with the Court. *Id.* ParkerVision's counsel from McKool

Smith responded around close-of-business that a different law firm, the

Kasowitz firm, would be representing ParkerVision on these issues, and that

the Kasowitz attorneys should also be served with the instant motion. *Id.*

In short, Qualcomm has tried to resolve this issue with ParkerVision,

but ParkerVision declined to cooperate with the urgency required. An order

from this Court is necessary, so that ParkerVision will take down its

disparaging and misleading statements in the media and cease any further

such public statements about the case, at least partially mitigating potential

bias in the jury venire.

## III.   ARGUMENT

### A. Trial Courts Have a Duty to Protect a Civil Litigant's Constitutional Right to a Fair Trial

Civil litigants have a constitutional right to an impartial jury. *See Thiel*

*v. S. Pac. Co.*, 328 U.S. 217, 220 (1946). In particular, the Supreme Court

"has long recognized that adverse publicity can endanger the ability of a

defendant to receive a fair trial" and, therefore, tasked trial judges with "an

affirmative constitutional duty to minimize the effects of prejudicial pretrial

publicity." *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979); *see also*

*United States v. Brown*, 218 F.3d 415, 423 (5th Cir. 2000) ("Few, if any,

interests under the Constitution are more fundamental than the right to a

fair trial by 'impartial' jurors, and an outcome affected by extrajudicial

statements would violate that fundamental right."). Thus, trial courts may

and regularly do proscribe "extrajudicial statements by any lawyer, party,

witness, or court official which divulge[] prejudicial matters." *Sheppard v.*

*Maxwell*, 384 U.S. 333, 361 (1966) (remarking that the "very purpose of a

court system" is to "adjudicate controversies, both criminal and civil, in the

calmness and solemnity of the courtroom . . ."). *Id.* at 350-51. Indeed, the trial

courts' power to prevent prejudice to the trial process is reflected in its

inherent authority to lawfully and orderly manage their cases. *See Thomas v.*

*Tenneco Packaging CO.*, 293 F.3d 1306, 1320 (11th Cir. 2002) ("Courts . . . are

universally acknowledged to be vested, by their very creation, with power to

impose silence, respect, and decorum, in their presence, and submission to

their lawful mandates."); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43

(1991) (recognizing the courts' powers are "governed not by rule or statute

but by the control necessarily vested in courts to manage their own affairs so

as to achieve the orderly and expeditious disposition of cases").

 "Although litigants do not 'surrender their First Amendment rights at

the courthouse door,' those rights may be subordinated to other interests that

arise in the context of both civil and criminal trials." *Seattle Times Co. v.*

*Rhinehart*, 467 U.S. 20, 37 n.18. Put another way, the duty of the courts to

curb prejudicial effects of pretrial publicity "comports with the constitutional

status of all First Amendment freedoms, which are not absolute but must
instead be applied in light of the special characteristics of the [relevant]
environment." *Brown*, 218 F.3d at 424 (citing *Tinker v. Des Moines Indep.
Cmty. Sch. Dist.,* 393 U.S. 503 (1969)). To that end, in the specific context of
pretrial publicity, courts have proscribed extrajudicial statements even after
considering a litigant's First Amendment rights because of the significant
and fundamental interest of the right to a fair trial. *See, e.g.*, *Am. Sci. &
Eng'g, Inc. v. Autoclear, LLC,* ("*American Science*") 606 F. Supp. 2d 617 (E.D.
Va. 2008) (enjoining defendant's extrajudicial statements, noting that false
and misleading statements are not covered by the First Amendment); *Mai v.
Nine Line Apparel, Inc.*, No. CV418-277, 2019 WL 5092478, at *7 (S.D. Ga.
Oct. 10, 2019) (enjoining plaintiff from extrajudicial publicity and rejecting
plaintiff's argument that doing so curtails her First Amendment rights).[1]

### B. ParkerVision's Media Campaign Poses a Serious Risk to Qualcomm's Constitutional Right to a Fair Trial Because It is Designed to, and Likely Will, Taint the Jury Pool

By ParkerVision's own account, its multi-media campaign is an
attempt to influence both the jury venire and this Court. As ParkerVision's
CEO states in the company's press release: "We believe this series will

---

[1] While much of the caselaw regarding pretrial publicity arises in the criminal context,
"[t]he Supreme Court has recognized that conflict between freedom of speech and the right
to a fair trial is no less troubling in the non-criminal context." *Bailey v. Systems Innovation,
Inc.*, 852 F.2d 93, 97-98 (3rd Cir.1998) (collecting cases).

2861680

provide valuable insight for our investors, partners, and the broader public as we hope to schedule a trial in 2025." Srinivasan Decl. Ex. A. Similarly, ParkerVision expressly pushes the jury venire to punish Qualcomm: "But maybe if you send a big fat message to some of these folks [i.e., Qualcomm], maybe then they'll get the picture." *Id.* Ex. B, at 4:37–4:54. Indeed, the timing alone of ParkerVision's media campaign is more than suspect. Mr. Parker himself acknowledges in his videos that he has known about these purported "facts" for over a decade—but chose to wait until now to inject these facts into public discourse. *Id.* Ex. B.

There is no legitimate purpose for ParkerVision's media efforts other than to taint the jury pool, exert pressure on the Court to set an early trial date (closer in time to their media campaign), and ultimately influence the outcome of this case. Under these circumstances, there is a reasonable and substantial likelihood that ParkerVision's extrajudicial commentary will undermine a fair trial. *See The News-J. Corp. v. Foxman*, 939 F.2d 1499, 1504 (11th Cir. 1991) (upholding the trial court's finding that "there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial," and upholding a restrictive order).[2] Accordingly, this Court has the

---

[2] *See also* S.D. Fl. R. 77.2(g) (prohibiting counsel from engaging in extrajudicial statements where "there is a reasonable likelihood that such dissemination will interfere with a fair trial"); N.D. Fl. R. 77.4(C) (similar); N.D. Fl. R. 77(4)(D) (similar).

2861680

power—and indeed the duty—to order appropriate protections so that the
integrity of the jury trial is preserved. *See Thomas*, 293 F.3d at 1320.

Courts in analogous circumstances have granted the relief sought here
(and more) where the statements at issue were less inflammatory and
widespread. *American Science*, also a patent case, is instructive. There, the
court granted the plaintiff's motion seeking injunctive relief arising from a
single press release issued by the defendants and distributed through
Business Wire that inaccurately suggested that the court denied plaintiff's
motion for summary judgment (in reality, the court previously denied a
motion for default judgment), and further falsely stated that the USPTO
formally rejected the plaintiff's patent claims (in reality, the PTO agreed to
reexamine plaintiff's claims). 606 F. Supp at 624. The *American Science* court
determined that the press release was issued intentionally and in bad faith
and that "issuance of a patently misleading press release on a nationally
available, widely-read internet site is completely irresponsible." *Id.* at 625.
Acknowledging civil litigants' constitutional right to an impartial jury and
the court's ability to "disallow prejudicial extrajudicial statements by
litigants that risk tainting or biasing the jury pool," the *American Science*
court found that the publishing of false information was egregious and
vexatious misconduct and ordered, inter alia: the removal of the press release
(both by defendants and "any other website which Defendants know are

15

displaying the [] press release"); the issuance of corrected press releases—
including to the extent defendants become aware of further third party
dissemination of the press release "or any article or publication based on the
press release;" and monetary sanctions. *Id.* at 625–26.

Notably, the *American Science* court granted relief even broader than
what Qualcomm seeks here, even though ParkerVision's media campaign is
significantly (and deliberately) farther-reaching than the defendants' in
*American Science*. Rather than issue a single misleading press release,
ParkerVision has engaged in a *multi-prong* media campaign that promises to
be ongoing and that so far includes a press statement, a high-production-
value video, and multiple interviews (which have been promulgated to
millions of listeners through The Glenn Beck Program alone). Again,
ParkerVision also openly admits that "[o]ur goal with *Against the Giants* is to
shed light on the facts of our case and offer a clear, compelling narrative . . .
[to] provide valuable insight for our investors, partners, and **the broader
public as we hope to schedule a trial in 2025.**" Srinivasan Decl. Ex. A
(emphasis added).

Courts have also enjoined litigants from making extrajudicial
statements where, as here, they were part of a marketing effort to put public
pressure on corporate defendants or sway the jury venire. In *Mai v. Nine Line
Apparel, Inc.*, a case involving discrimination claims, the court determined

16

that plaintiff's interviews and her publicizing those appearances on her

personal Facebook page were "an effort to apply public pressure on

Defendant and influence the public's perception about the merits of this

action." 2019 WL 5092478, at *4. In ruling that the "such pre-trial publicity

would present a substantial likelihood of prejudicing a fair trial in this case,"

the court noted that the plaintiff was a self-proclaimed "marketing and PR

guru" who was "closely monitoring the reactions her interview [was]

gathering." *Id.*

So too here. ParkerVision has demonstrated its marketing fluency,

investing considerable time, effort, and resources into producing media with

the express goal of swaying public opinion ahead of the forthcoming trial.

Among other things, the company self-produced a high-production-value,

documentary-style video featuring their key trial witnesses telling their one-

sided story—and then launched that video on multiple platforms, including

YouTube, Facebook, and X. Additionally, like the *Mai* plaintiff, ParkerVision

gave multiple interviews, including the Glenn Beck Program and the OANN,

and subsequently reposted those interviews on the company's social media

pages.[3] Further, Mr. Parker has made clear that the Company tracks online

---

[3] A key theme of ParkerVision's campaign is—the supposed "ship[ping] off" of its
technology to China. *See, e.g.*, Srinivasan Decl. Ex. D; *id.* Ex. B, at 3:26–3:49 ("**90%
of the intellectual property theft is committed by China.** Semiconductor
technology, wireless technology—all of this stuff has been ripped off and taken to

17

impression and views. *See* Srinivasan Decl. Ex. F, at 12:07–12:18 (tracking
views of the company website to assert that someone in the White House had
visited ParkerVision's website).

The *Mai* court also noted that the *timing* of plaintiff's media efforts was
suspect, as they took place after an unsuccessful mediation. 2019 WL
5092478, at *4. Similarly, ParkerVision launched its media campaign shortly
after the court indicated in December 2024 that it intended to set the case for
trial soon—and after Qualcomm respectfully moved for reconsideration of the
Court's decision *not* to revisit the proper construction of disputed terms, as
discussed in the Federal Circuit's recent opinion. ECF No. 753. Indeed, in a
recent submission providing the Court with potential trial dates,
ParkerVision insisted that the parties include joint dates as early as
possible—including as early as April 2025, which is just two months after the
launch of ParkerVision's "Against the Giants" media campaign and will likely
align with the release of the four-part video series. ECF No. 753; Srinivasan
Decl. Ex. A (noting that the series will be released "in the coming weeks").
ParkerVision makes no attempt to mask its desire to pressure the Court for
an earlier trial date, which would presumably require the Court to forgo

---

China. So, if you're a small innovator, your stuff can be taken from China….")
(emphasis added). Claims that Qualcomm is abetting theft by China are false, and
this kind of overt extrajudicial animus has served as a basis for enjoining such
statements. *See, e.g.*, *Aaron v. Durrani*, No. 1:13-cv-202, 2013 WL 12121516, at *2
(D. Md. Oct. 1, 2013).

further claim construction. As part of its campaign, ParkerVision indicates

that it wants a trial date as soon as possible, and insinuates that something

nefarious could be delaying trial: "We're now going on our 11th year. Why is

it taking so long to get a trial in our second lawsuit?" Srinivasan Decl. Ex. B.

### C. Qualcomm's Requested Relief is Narrowly Drawn, and No Less Restrictive Alternatives are Viable

The relief that Qualcomm seeks is narrowly tailored to counteract the

improper effects of ParkerVision's false and misleading media campaign and

preserve the integrity of the upcoming jury trial. Namely, and as set forth

below and in Qualcomm's Proposed Order, Qualcomm respectfully requests

that this Court order ParkerVision to remove and/or cause the removal of the

false and misleading public statements regarding this case, and cease further

misleading or disparaging public statements regarding the parties' dispute.

Qualcomm's request is modest; it does not, for example, demand that

ParkerVision issue a corrective statement to counteract the false and

misleading statements associated with its media campaign, although it is

clearly within the Court's power to order such relief, and courts have done so

in analogous cases. *See, e.g.*, *American Science*, 606 F. Supp. 2d at 626

(ordering defendant, among other things, to issue a corrected press release).

Further, Qualcomm's requested relief is appropriate as no less

restrictive alternatives are viable here. As the *Mai* court noted, "[a]lthough

19

other less restrictive means to avoid the effects of pre-trial publicity are
available, such as extensive voir dire and focused jury instructions… 'the best
approach to curing the effects of pretrial publicity involves those remedial
measures that will prevent the prejudice at its inception.'" 2019 WL 5092478,
at *6 (cleaned up); *see also United States v. Scrushy*, 2004 WL 848221 at *6
(N.D. Ala. Apr. 13, 2004) ("While the court anticipates a rigorous voir dire
and 'emphatic' jury instructions, the prophylactic measure of a restraint on
extrajudicial comments by the trial participants plays an essential role in
ensuring a fair trial in this case").

### D. Qualcomm's Requested Relief is Necessary to Prevent Irreparable Harm That Outweighs Any Potential Injury to ParkerVision and Will Not Harm the Public Interest (Local Rule 6.01(b))

Given the extraordinary extrajudicial statements outlined above, there
are more than sufficient grounds to issue a temporary restraining order and
preliminary injunction consistent with Local Rule 6.01(b). Namely, there
exists (1) a substantial likelihood of succeeding on the merits; (2) a
substantial threat of irreparable injury if relief is denied; (3) an injury that
outweighs the opponent's potential injury if relief is granted; and (4) that the
requested injunction would not harm the public interest. *See Four Seasons
Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir.
2003); *Gold Coast Publ'ns, Inc. v. Corrigan*, 42 F.3d 1336, 1343 (11th Cir.

2861680

1994) (listing same factors to consider for preliminary injunction).

For the reasons stated herein (*see supra* Sections III(A) & (B)),
Qualcomm has a constitutional right to a fair trial, and this court has the
authority and duty to "minimize the effects of prejudicial pretrial publicity."
*Gannett*, 443 U.S. at 378. *See, e.g.*, *American Science*, 606 F. Supp. 2d at 625-
26. Failure to grant the relief requested puts Qualcomm at risk of irreparable
injury. *See Brown*, 218 F.3d at 423 ("Few, if any, interests under the
Constitution are more fundamental than the right to a fair trial by 'impartial'
jurors, and an outcome affected by extrajudicial statements would violate
that fundamental right."). This is especially so, given that ParkerVision
promises to post at least three more videos in its "Against the Giants" series
in the coming weeks, to coincide with some of the trial dates previously
suggested by the parties. Indeed, as evidenced by ParkerVision's media
efforts, the release of the forthcoming "Against the Giants" episodes will
likely not occur in isolation. ParkerVision may again deliberately time the
episode releases to coincide with media appearances by Mr. Parker and social
media activity, to bolster views and garner greater public attention.

In addition, in contrast to broadcast television, social media and
internet platforms—which permit further public discourse and dialogue
including in the comment sections—effectively memorialize media coverage
because posts remain online indefinitely. *See, e.g.*, *Mai*, 2019 WL 5092478, at

2861680

*4 (analyzing the comment section of plaintiff's social media pages in connection to her media efforts and extrajudicial statements). Any potential injury to ParkerVision's First Amendment rights in this context is therefore greatly outweighed by Qualcomm's due process rights here (*see supra* Section III). *See, e.g.*, *American Science*, 606 F. Supp. 2d at 626 (ordering defendant to remove press release, noting that false and misleading statements are not covered by the First Amendment); *Mai*, 2019 WL 5092478, at *7 (enjoining plaintiff from extrajudicial publicity and rejecting plaintiff's argument that doing so curtails her First Amendment rights).

Finally, the requested relief would not harm the public interest; on the contrary, "[t]he interests of the public and the defense in the right to a fair trial are protected when a court vigilantly acts to prevent the prejudicial effects of pretrial publicity." *Scrushy*, 2004 WL 848221, at *4. Indeed, the public has its own compelling interest "in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949).

## IV. The Court Should Issue the Requested Relief Without Bond, or Alternatively with a $5,000 Bond.

"While a bond is . . . normally required, 'it is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all.'" *TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla.

22

2013) (granting injunction without bond in trademark action and collecting

cases). Here, Qualcomm has a high probability of succeeding on the merits of

its requested injunctive relief given the egregious nature of ParkerVision's

conduct; and neither ParkerVision nor the public has an interest in ongoing,

misleading statements that impugn the Court's integrity and bias the jury

venire. Accordingly, Qualcomm respectfully requests the Court enter its

requested relief without requiring security, or else with a security of $5,000.

## V. CONCLUSION

In order to preserve Qualcomm's constitutional right to an impartial

jury, and for all of the reasons set forth above, Qualcomm respectfully asks

the Court to enter the concurrently filed Proposed Order as follows:

1.    Within 24 hours of the entry of this Order, ParkerVision shall

remove from its website, the January 30, 2025 press release posted at 8:35

a.m. announcing its "Against the Giants" video series" ("Press Release"); all

links on its website or social media accounts to the Press Release, all posts on

its website or social media accounts referencing or linking to the "Against the

Giants" video series, Mr. Parker's recent Glenn Beck interview, and his

interview at One America News Network ("OANN"), and any other

misleading public comments Mr. Parker or other ParkerVision affiliates,

representatives, or agents have made regarding litigation between

ParkerVision and Qualcomm;

2861680

2.     Within 24 hours of the entry of this Order, ParkerVision shall
contact all third parties to whom it has provided, or who have re-posted or
linked to ParkerVision's "Against the Giants" video series, Mr. Parker's
recent Glenn Beck interview, Mr. Parker's interview at One America News
Network ("OANN"), and any other misleading public comments Mr. Parker or
other ParkerVision affiliates, representatives, or agents have made regarding
litigation between ParkerVision and Qualcomm, and request those third
parties to remove all such materials from their websites and not to further
distribute any of such materials.

3.     To the extent that ParkerVision becomes aware of further
dissemination by a third party of the aforementioned statements, press
releases, or videos, ParkerVision will immediately upon learning of such
further dissemination (within 24 hours) request that the third-party remove
those statements and cease further dissemination.

4.     ParkerVision, its affiliates, and all those persons in active concert
or participation with any of them who receive notice of this Order, shall be
temporarily restrained and enjoined from, in any manner, either directly or
indirectly, from issuing any further false or misleading public statements
regarding the parties' dispute, including false or misleading information on
the outcome of the parties' previous lawsuit and speculation about the
supposed "delay" in setting a trial in the instant lawsuit; and cease any

24

further efforts to influence the jury venire, including by releasing further

videos in the "Against the Giants" series.

5.    Within 3 days of this Order, ParkerVision shall file a statement

with the Court stating what steps it has taken to comply with this Order.

Qualcomm further reserves all its right to seek additional relief as

appropriate, including but not limited to seeking: to set trial for one of the

later, agreed-upon dates by the parties (as set forth in their pending

submission) to minimize the risk of jury bias from ParkerVision's media

campaign; to file additional motion(s) in limine in connection with the media

campaign; additional voir dire; to sequester the jury; and all other

appropriate sanctions in connection with this briefing.

### Local Rule 3.01(g) Certification

Pursuant to Local Rule 3.01(g), the parties conferred by

videoconference call on February 3, 2025 on the substance of Qualcomm's

cease-and-desist letter. Qualcomm subsequently informed ParkerVision by

email of its intent to file the instant motion.  As of the time of this filing,

ParkerVision has failed to respond.

2861680

Respectfully submitted,

Dated:  February 4, 2025          KEKER, VAN NEST & PETERS LLP

By:  */s/ Robert A. Van Nest*
Robert A. Van Nest (special admission)
Matthew M. Werdegar (special admission)
Sophie Hood (special admission)
Anjali Srinivasan (special admission)
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile:  415 397 7188
rvannest@keker.com
mwerdegar@keker.com
shood@keker.com
asrinivasan@keker.com

**CARLTON FIELDS, P.A.**
Daniel C. Johnson
Florida Bar No.  522880
200 S. Orange Ave.
Suite 1000
Orlando, FL 32801
Telephone: (407) 849-0300
Facsimile:  (407) 648-9099
djohnson@carltonfields.com

**COOLEY LLP**
Matthew Brigham (admitted pro hac vice)
Dena Chen (admitted pro hac vice)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone: (650) 843-5000
Facsimile:  (650) 843-7400
Dchen@cooley.com
Mbrigham@cooley.com

**COOLEY LLP**
Eamonn Gardner (pro hac vice)
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Telephone: (720) 566-4000
Facsimile:  (720) 566-4099
Egardner@cooley.com

Attorneys for Defendants QUALCOMM
INCORPORATED and QUALCOMM
ATHEROS, INC.

26

<u>CERTIFICATE OF SERVICE</u>

I certify that on February 4, 2025, I electronically filed the foregoing

with the Clerk of the Court by using the CM / ECF system.  I further certify

that I served the foregoing document and the notice of electronic filing by

email to the following non-CM / ECF participants:

| | |
|---|---|
| Daniel C. Johnson<br>**Carlton Fields, P.A.**<br>200 S. Orange Ave., Ste 100<br>Orlando, FL 32801<br>djohnson@carltonfields.com | *Attorneys for Defendants*<br>*QUALCOMM, INC. and*<br>*QUALCOMM ATHEROS, INC.* |
| Dena Chen<br>Matthew Brigham<br>**Cooley LLP**<br>3175 Hanover St<br>Palo Alto, CA 94304<br><br>Eamonn Gardner<br>**Cooley LLP - Colorado**<br>1144 15th St., Suite 2300<br>Denver, CO 80202<br>QCParkervision@cooley.com | *Attorneys for Defendants*<br>*QUALCOMM, INC. and*<br>*QUALCOMM ATHEROS, INC.* |
| Ava K. Doppelt<br>Brian R. Gilchrist<br>Ryan Thomas Santurri<br>**Allen, Dyer, Doppelt, & Gilchrist, PA**<br>255 S. Orange Ave. - Ste 1401<br>PO Box 3791<br>Orlando, FL 32801<br>adoppelt@allendyer.com<br>bgilchrist@allendyer.com<br>rsanturri@allendyer.com | *Attorneys for Plaintiff and Counter Defendant*<br>*PARKERVISION, INC.* |

27

2861680

| | |
|---|---|
| Ayana M. Rivers<br>**McKool Smith, P.C.**<br>1301 Avenue of the Americas, 32nd Floor<br>New York, NY 10019<br>arivers@mckoolsmith.com<br><br>Kevin Burgess<br>**McKool Smith P.C.**<br>104 East Houston, Suite 300<br>Marshall, TX 75670<br>kburgess@McKoolSmith.com<br><br>John B. Campbell, Jr.<br>Kyle N. Ryman<br>Joshua W. Budwin<br>**McKool Smith**<br>303 Colorado St., Suite 2100<br>Austin, TX 78701<br>jcampbell@mckoolsmith.com<br>kryman@mckoolsmith.com<br>jbudwin@mckoolsmith.com<br>ParkerVisionII-Qualcomm@McKoolSmith.com | *Attorneys for Plaintiff and Counter Defendant*<br>*PARKERVISION, INC.* |
| Marc E. Kasowitz<br>Albert Mishaan<br>Maria H. Ruiz<br>Jacob Abrams<br>**Kasowitz Benson Torres LLP**<br>1441 Brickell Ave., Suite 1420<br>Miami, Florida 33131<br>MKasowitz@kasowitz.com<br>AMishaan@kasowitz.com<br>MRuiz@kasowitz.com<br>JAbrams@kasowitz.com | *Attorneys for Plaintiff and Counter Defendant*<br>*PARKERVISION, INC.* |

*/s/ Robert Van Nest*
Robert Van Nest