# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| PARKERVISION, INC., | |
| Plaintiff, | |
| v. | CASE NO.  6:14-cv-00687-PGB-LRH |
| QUALCOMM INCORPORATED, and QUALCOMM ATHEROS, INC., | |
| Defendants. | |

## DEFENDANTS' SUPPLEMENTAL OPENING CLAIM CONSTRUCTION BRIEF IN LIGHT OF THE COURT'S APRIL 17, 2025 ORDER (DKT. 794)

2839078

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  ARGUMENT ....................................................................................... 2

    A.  "whereby the energy provided to the load forms a down-
    converted signal" ('907 patent)................................................... 2

    B.  "a storage device storing energy from said UFT module"
    ('940 patent) ............................................................................. 15

III.  CONCLUSION ................................................................................. 18

2839078

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Federal Cases</u>

*Dayco Products, Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001)..................................................................................7

*Digital Biometrics, Inc. v. Identix, Inc.*,
  149 F.3d 1335 (Fed. Cir. 1998)..................................................................................5

*Eon Corp. IP Holdings v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016).........................................................................3, 4, 16

*MySpace v. GraphOn*,
  672 F.3d 1250, 1256 (Fed. Cir. 2012)......................................................................17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008).............................................................................3, 16

*ParkerVision I. ParkerVision v. Qualcomm*,
  621 F. App'x 1009 (Fed. Cir. July 31, 2015).......................................................9, 11, 12

*ParkerVision v. Qualcomm*,
  903 F.3d 1354 (Fed. Cir. 2018)................................................................................15

*ParkerVision v. Qualcomm*,
  Nos. 2014-1612, 2014-1655, 2014 WL 4802308 (Fed. Cir. Sept. 15, 2014) ....................9

*ParkerVision, Inc. v. Qualcomm Inc.*,
  116 F.4th 1345 (Fed. Cir. 2024) ..........................................................................5, 18

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..................................................................... *passim*

*Tempo Lighting, Inc. v. Tivoli, LLC*,
  742 F.3d 973 (Fed. Cir. 2014)..................................................................................10

2839078

## I.    INTRODUCTION

Defendants Qualcomm Incorporated, and Qualcomm Atheros, Inc. (collectively, "Qualcomm") respectfully ask the Court to adopt Qualcomm's proposed constructions for two material terms that are in dispute between the parties: the term "whereby the energy provided to the load forms a down-converted signal," in asserted claim 1 of U.S. Patent No. 7,218,907 ("the '907 patent"), and the term "a storage device storing energy from said UFT module," in asserted claims 24 and 331 of U.S. Patent No. 6,091,940 ("the '940 patent").

For the term "whereby the energy provided to the load forms a down-converted signal," the Court should adopt Qualcomm's proposed construction, which is based on the intrinsic record and further supported by extrinsic evidence. The Court should reject ParkerVision's proposed construction, which it proffered during summary judgment and on appeal to the Federal Circuit. There is no support in the intrinsic record for ParkerVision's construction; rather, the intrinsic evidence is directly to the contrary. ParkerVision's construction is also inconsistent with extrinsic

evidence, including the evidence that ParkerVision has previously pointed to in support of its construction.[1]

For the term "a storage device storing energy from said UFT module," Qualcomm's proposed construction is again consistent with both the intrinsic and extrinsic evidence. Indeed, both Qualcomm's and ParkerVision's technical experts understand the claimed invention in a way that is consistent with Qualcomm's proposed construction.

## II.  ARGUMENT

### A.  "whereby the energy provided to the load forms a down-converted signal" ('907 patent)

| Claim Term | Qualcomm's Proposed Construction |
|---|---|
| whereby the energy provided to the load forms a down-converted signal | whereby the energy provided to the load generates a down-converted signal |

Asserted independent claim 1 of the '907 patent, which claims "a method for down-converting an electromagnetic signal," recites "**whereby**

---

[1] Qualcomm has attached non-confidential examples of extrinsic evidence that supports it constructions of the disputed terms.  There is additional, consistent evidence, currently designated confidential by ParkerVision, that Qualcomm could add, if the court permits.

**the energy provided to the load forms a down-converted signal**."[2] '907 patent at 131:13-14. The parties dispute whether this term describes and claims that the energy provided to the load **generates** a down-converted signal or whether the energy provided to the load **shapes** an already existing down-converted signal.

As an initial matter, it is not sufficient to instruct the jury that the "plain and ordinary" meaning applies to the phrase "whereby the energy provided to the load forms a down-converted signal." *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."). In *Eon Corp. IP Holdings v. Silver Spring Networks*, for example, the parties disputed whether the terms "portable" and "mobile" should be construed so broadly that they covered "fixed or stationary products that are only theoretically capable of being moved." 815 F.3d 1314, 1319 (Fed. Cir. 2016). The district court did not resolve this

---

[2] All internal quotation marks, citations, and alterations have been omitted from citations, and all emphases added to citations and quotations from the record, unless noted.

dispute over claim scope, determining only that the terms should be given their "plain and ordinary meaning." *Id.* The Federal Circuit held that this was legal error. *Id.* The same is true here. Without a construction, the parties' dispute about the meaning and scope of "forms" in the phrase "whereby the energy provided to the load forms a down-converted signal" is not resolved and would improperly be left to the jury to sort out. Consequently, the Court should construe the phrase, and it should adopt Qualcomm's proposed construction.

To support its infringement theory, ParkerVision maintains that the energy provided directly to the claimed load and storage device is "already down-converted energy." Attach. 1 at 34. Put another way, ParkerVision argues that the output of the switch that is "up-stream" from the storage device and load is the down-converted signal. Dkt. 327 at 15. As a consequence, ParkerVision is forced to argue that the energy subsequently provided to the load from the storage device does not "form," *i.e.,* generate or create, the down-converted signal, but is merely "shaping" the existing, already down-converted signal. Attach. 1 at 32. Neither the intrinsic evidence nor the relevant extrinsic evidence supports ParkerVision's strained construction.

"The proper approach to determining claim scope is to 'look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *See ParkerVision, Inc. v. Qualcomm Inc.*, 116 F.4th 1345, 1357 (Fed. Cir. 2024). When considered with proper context, the intrinsic evidence plainly describes that the energy provided to the load *generates* a down-converted signal.

*First*, the claim itself, and in particular the context in which the term is used, supports Qualcomm's proposed construction. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (noting "the claims themselves provide substantial guidance as to the meaning of particular claim terms" and in particular, "the context in which a term is used in the asserted claim can be highly instructive"); *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("Even within the intrinsic evidence, however, there is a hierarchy of analytical tools. The actual words of the claim are the controlling focus."). The term appears as the last limitation in claim 1 and introduces the notion of a down-converted signal:

2839078

1. A method for down-converting an electromagnetic signal, comprising:

    periodically coupling an electromagnetic signal that includes a carrier signal to an energy storage device and a load, wherein the periodic couplings occur at a rate less than twice the frequency of the carrier signal;

    providing, during the periodic couplings, energy from the electromagnetic signal to the energy storage device, thereby changing an amount of energy stored by the energy storage device;

    providing, during the periodic couplings, energy from the electromagnetic signal to the load; and

    providing, between the periodic couplings, energy from the energy storage device to the load, thereby changing the amount of energy stored by the energy storage device;

    whereby the energy provided to the load forms a down-converted signal.

'907 patent, claim 1 (annotated).

ParkerVision argues the claim recites a "down-converted electric current that flows directly to the load." Attach. 1 at 31. But this is directly refuted by the claim language itself: a "down-converted signal" is not recited in the claim at any point prior to the recitation of energy being provided to the load and storage device. In other words, while ParkerVision argues that the down-converted signal is somewhere and somehow generated and exists in the "providing, during the periodic couplings" limitations, the claim itself fails to recite a "down-converted signal" in those limitations. Then, when "a down-converted signal" is first recited in conjunction with "forms,"

2839078

ParkerVision claims that is just "shaping" an existing (but never before

recited, discussed, or referenced) down-converted signal.

> 1. A method for down-converting an electromagnetic
> signal, comprising:
>     periodically coupling an electromagnetic signal that
>         includes a carrier signal to an energy storage device and
>         a load, wherein the periodic couplings occur at a rate
>         less than twice the frequency of the carrier signal;
>     providing, during the periodic couplings, <u>energy from the
>         electromagnetic signal to the energy storage device</u>,
>         thereby changing an amount of energy stored by the
>         energy storage device;
>     providing, during the periodic couplings, <u>energy from the
>         electromagnetic signal to the load</u>; and
>     providing, between the periodic couplings, energy from
>         the energy storage device to the load, thereby changing
>         the amount of energy stored by the energy storage
>         device;
>     whereby the energy provided to the load <u>forms a down-
>         converted signal</u>.

ParkerVision argues this energy is already a down-converted signal despite no reference to it as such

'907 patent, claim 1 (annotated).

ParkerVision's interpretation is illogical and ignores the context in

which the term is used and the ordinary meaning of the term. The only

logical interpretation of the term when considered in the context of the full

claim is that when the down-converted signal is recited for the first time as

being "formed" in the last limitation, that means the signal is being

generated. *See Dayco Products, Inc. v. Total Containment, Inc.*, 258 F.3d

1317, 1324 (Fed. Cir. 2001) (noting courts should reject "convoluted and

artificial" claim constructions and claims should be interpreted "from the

2839078

perspective of one of ordinary skill in the art, … not from the viewpoint of counsel or expert witnesses retained to offer creative arguments in infringement litigation").

*Second,* the specification supports Qualcomm's proposed construction – and provides no support for ParkerVision's proposed construction. *See Phillips*, 415 F.3d at 1315 (Fed. Cir. 2005) ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'") "Forms" is not discussed in '907 patent's specification in conjunction with "shape" or "shaping," and "forms" is not used in a manner that is synonymous with "shapes." Instead, where "forms" is discussed in the relevant context in the specification, it is used in a way that is synonymous with "generates."

For example, in describing Figure 83D, which is a signal output by the structure in Figures 82A and 82B, *see* '907 patent at 69:4:5, the '907 patent's specification uses the term "formed" in a way that is synonymous with "generates." The specification states that "FIG. 83D illustrates a down-converted signal 8310 that *is formed by energy* transferred from the input EM signal 8302." '907 patent at 69:21-23 (emphasis added); *see also id.* at 100:4-7 ("FIG. 83D illustrates the transferred energy stored in the storage module 6506. The storage module 6506 outputs the transferred energy as

the downconverted signal 1308B."). Indeed, ParkerVision itself has relied on the structure in Figure 82A to describe "generating" a down-converted signal using transferred energy.[3] *See, e.g., ParkerVision v. Qualcomm*, Nos. 2014-1612, 2014-1655, 2014 WL 4802308, at *16-19, *30-31 (Fed. Cir. Sept. 15, 2014) (relying on Fig. 82A to describe "generating" down-converted signal using energy stored in a capacitor); and Attach. 2 at 276:3-277:8 (using Figures 82 and 59E to describe "generating step"). And the Federal Circuit has cited Figure 82A to describe the claimed "generating" limitation in *ParkerVision I. ParkerVision v. Qualcomm*, 621 F. App'x 1009, 1011-12 (Fed. Cir. July 31, 2015).

To support its "shaping" theory on appeal, the only portion of the specification to which ParkerVision pointed was Figures 57E and 57F, which ParkerVision described as examples of a "shaped" signal. Attach. 1 at 32. But directly contrary to ParkerVision's characterization, the specification describes the signal in Figure 57E as a "generated" signal: "FIG. 57E illustrates a demodulated baseband signal S712, *which is* **generated** *by the down-conversion process*." *See* '907 patent at 87:9-10

---

[3] The '907 patent is a continuation-in-part of U.S. Patent No. 6,601,551 ("the '551 patent") and specifically incorporates by reference the entirety of the '551 patent. '907 patent at 1:6-18. Figure 82A in the'907 patent and '551 patent is identical.

(emphasis added). Indeed, Mr. Sorrells, one of the alleged inventors of the asserted patents and ParkerVision's Chief Technical Officer, agrees that Figure 57E depicts an embodiment of "generating" the down-converted signal using the transferred energy. *See* Attach. 3 at 87:6-11 and 88:6-14.

In previous pleadings, ParkerVision relied primarily on extrinsic evidence—in form of expert testimony—to support its "shaping" construction. But as the Federal Circuit has repeatedly admonished, courts must "give[ ] primacy" to intrinsic evidence and resort to extrinsic evidence to construe claims only if it is consistent with the intrinsic evidence. *See Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014); *see also Phillips*, 415 F.3d at 1318 ("[A] court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history."). ParkerVision's expert testimony is not only fundamentally *inconsistent* with the intrinsic evidence, it also falls apart upon closer scrutiny.

During briefing for the first motion for summary judgment of collateral estoppel, ParkerVision's expert Dr. Allen pointed to Figure 126A in an attempt to show that the down-converted signal can be generated by

2839078

the switch that exists "up-stream" of the energy storage device.[4] *See* Dkt.
327 at 15. But Dr. Allen omitted the critical fact that Figure 126A shows a
voltage mode embodiment of the claimed invention. *See* '907 patent at 10:1-
14, Fig. 126A (showing voltage signals), Fig. 126E (units in the graph are
"mV," which stands for milliVolts, a unit of voltage). As was extensively
addressed in *ParkerVision I*, unlike a current signal which flows along a
wire, a voltage signal "is the same everywhere along an electric wire."
*ParkerVision*, 621 F. App'x. at 1015-16.[5] Accordingly, the capacitor, *i.e.*, the
claimed energy storage device, in Figure 126A is not "down-stream" of the

---

[4] As noted by the Federal Circuit in its remand order, there was some ambiguity
on appeal as to whether Dr. Steer adopted Dr. Allen's declaration. *See*
ParkerVision, F.4th at 1358 n.5. Qualcomm respectfully submits that Dr. Steer
did not adopt Dr. Allen's declaration. The Court's order allowing Dr. Steer to
substitute for Dr. Allen does not reference any adoption by Dr. Steer of Dr.
Allen's declaration, *see* ECF No. 479, and nowhere in the record does Dr. Allen
explicitly do so. Given that ParkerVision has withdrawn Dr. Allen, and Dr. Steer
did not adopt Dr. Allen's declaration, Qualcomm submits that ParkerVision
cannot rely on Dr. Allen's declaration. However, to the extent ParkerVision is
permitted to provide any expert opinions, Qualcomm submits that Dr. Steer
must adopt Dr. Allen's opinions and not provide alternative expert opinions. *See
id.* at 8.
[5] In addition, the differences between a voltage-mode embodiment such as
Figure 126A and the current-mode devices at issue in this litigation makes
Figure 126A of little relevance. *ParkerVision*, 621 F. App'x. at 1015-16. As
ParkerVision itself argued in *ParkerVision I*, "it 'makes no sense' to pinpoint a
specific location along a wire where the baseband signal is generated" for a
voltage mode device "because all the points along the wire 'are one and the same
point.'" *Id*. at 1015.

11

switch—the capacitor is along the same wire or point 12644,[6] and is consequently at "one and the same point" as the switch and directly generates the down-converted signal at that point. *Id.*

This is confirmed in the '907 patent specification. For example, the '907 patent states that "Capacitor C1 is the *storage element* for the input signal being sampled by FETs 12602-12640" in Figure 126A (all directly connected to wire or point 12644). '907 patent at 111:17-19. The specification further states that "FIG. 126E illustrates a down-converted signal at point 12644 of FIG. 126A, which is generated by the down-conversion process" using the claimed "energy storage device." *Id.* at 111:31-33. And "the down-conversion process" disclosed in Section 5 of the specification consistently confirms that the down-converted signal requires energy output from the energy storage device. *See id.* at 100:5-10 ("The storage module 6506 outputs the transferred energy as the down-converted signal 1308B."); *see also id.* at 100:58-61 ("The storage module 6716, is similar to the storage module 6506 FIG. 65. The break-before-make gated transfer system 6701 down-converts the EM signal 1304 in a manner similar to that described with reference to the gated transfer system 6501

---

[6] Hexagons labelled "SP2" in FIG. 126A are used to indicate that Capacitor C1 is on the same wire or voltage point as wire or point 12644.

in FIG. 65."). Accordingly, even in an embodiment where the switch and capacitor are inverted—including the embodiment Dr. Allen specifically relies on—generating the down-converted signal still requires energy from the energy storage device.

Furthermore, Qualcomm's expert Dr. Razavi has offered an opinion consistent with Qualcomm's proposed construction that the load *generates* a down-converted signal. *See* Dkt. 527, Ex. 2 at ¶¶ 805-810. And ParkerVision's own expert Dr. Allen testified during his deposition that he understood the claim in the same way:

> Q:  And that would be true of the '907 claims as well, that they would require producing the low frequency baseband signal using energy that has been transferred from a high frequency carrier signal into a storage medium; correct?
>
> A:  With the same stipulation that that's only part of the signal producing the down – a downconverted voltage.
>
> Q:  But that's part of the requirement; correct?
>
> A:  Yes, according to the patent.

*See* Dkt. 499, Ex. 27 at 211:6-16; *Phillips*, 415 F.3d at 1317 ("we have also authorized district courts to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony ..."). Moreover, the testimony from every expert in this case is also consistent with the testimony from the alleged

13

inventors.  For example, Mr. Sorrells testified that energy transfer sampling (the purported invention that forms the basis of the '907 patent) involves generating the down-converted signal using energy stored in an energy storage device. *See* Attach. 3 at 171:6-23 (confirming that "in energy transfer" the down-converted signal is generated from stored energy).

In sum, Qualcomm's proposed construction is supported by the intrinsic evidence, including the language of the claim itself, and is consistent with the expressed understanding of both parties' technical experts as well as the alleged inventors. The Court should therefore adopt Qualcomm's proposed construction to resolve the parties dispute over the scope of the asserted '907 patent claims.

2839078

**B.**   **"a storage device storing energy from said UFT module" ('940 patent)**

| Claim Term | Qualcomm's Proposed Construction |
|---|---|
| a storage device storing energy from said UFT module | a storage device storing energy from said UFT module and using that energy to generate a down-converted signal |

Turning to the '940 patent, ParkerVision asserts the "receiver elements" of dependent claims 24 and 331,[7] because apparatus claims 22 and 23 were invalidated by the Patent Office.  Dkt. 499, Ex. 14, Allen Op. Rpt., ¶ 499; *ParkerVision v. Qualcomm*, 903 F.3d 1354, 1362 (Fed. Cir. 2018). Both asserted claims 24 and 331 require "**a storage device storing energy from said UFT module**." '940 patent at 69:66-67.  With respect to this term, the parties dispute whether (i) as Qualcomm proposes, the claimed storage device uses stored energy to generate a down-converted signal, or (ii) as ParkerVision now proposes, the claimed storage device merely stores energy from the UFT module, without any requirement that the stored energy be used for any purpose.

Without a construction, the parties' dispute about the scope of '940 patent receiver claims is not resolved and would result in the same error as

---

[7] ParkerVision also asserts the "transmitter" elements of claims 25, 26, 368, and 369.

2839078

in *O2 Micro* and *Eon*. Qualcomm therefore respectfully requests that the Court enter the following claim construction for this disputed claim term: "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal." Qualcomm's construction is consistent with the *Phillips* analysis.

Starting with the intrinsic record, claim 24 recites a particular approach to down-converting using a Universal Frequency Translation (UFT) module that requires "aliasing" the signal and "transferring energy" from the signal to a "storage device." '940 patent, claim 24. The '940 patent specification confirms that the claimed form of down-conversion uses the energy stored in the storage device to generate the down-converted signal. *See, e.g., id.* at 57:27-58:19 (Section "6.3 Summary Description of Down-conversion Using a Universal Frequency Translation Module"), including 58:9-19 (stored charge is used to generate down-converted signal). The specification explicitly states: "[t]he train of pulses 6418 as shown in FIG. 64D controls the switch 6408 to alias the input signal 6404 with the control signal 6406 *to generate a down-converted output signal 6412*." *Id.* at 58:9-19 (emphasis added). In other words, the claimed storage device does not merely store energy from the UFT module, but the stored energy is in fact used to **generate the down-converted signal**.

Qualcomm's construction is also consistent with relevant extrinsic evidence, including how the ParkerVision inventors understood their own alleged invention. *Phillips*, 415 F.3d at 1317. ParkerVision's own inventors repeatedly confirmed that their alleged invention relates to using energy stored in the storage device to generate the down-converted signal. *See, e.g.*, Dkt. 499, Ex. 29 at 199:9-200:16; Dkt. 499, Ex. 31 at 178:19-179:4. ParkerVision's attorneys are not entitled to a construction that is broader than what the inventors actually invented. *MySpace v. GraphOn*, 672 F.3d 1250, 1256 (Fed. Cir. 2012) ("An inventor is entitled to claim in a patent what he has invented, but no more .... Therefore, in construing a claim there are two limiting factors — what was invented, and what exactly was claimed."). Accordingly, the correct construction of "a storage device storing energy from said UFT module" is "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal."

Furthermore, all of the experts—persons of skill in the art—agree that the claimed storage device uses stored energy to *generate a down-converted signal*. Qualcomm's expert Dr. Razavi understands the claim this way. *See* Dkt. 527, Ex. 2 at ¶¶ 823-829. And during deposition, both of ParkerVision's experts, Dr. Allen and Dr. Steer, confirmed that they too understood the claim this way. *See* Dkt. 499, Ex. 27 at 216:21-219:25; Dkt.

17

499, Ex. 43 at 74:18-24. "ParkerVision's experts … testified in deposition that the receiver claims of the '907 and '940 patents 'require that you produce a lower-frequency signal ***using energy that's been transferred from a higher-frequency signal into a storage medium***.'" *ParkerVision*, 116 F.4th at 1359. Indeed, Dr. Allen even confirmed his understanding twice—first when offering his invalidity opinions, *see* Dkt. 499, Ex. 14 at ¶ 231, and then again at his deposition *see* Dkt. 499, Ex. 27 at 216:21-219:25.

In sum, Qualcomm's proposed construction of the disputed term is consistent with and strongly supported by both the intrinsic and relevant extrinsic evidence. The Court should adopt it to resolve the parties' dispute over the scope of the '940 patent receiver claims.

## III.    CONCLUSION

For the reasons stated herein, Qualcomm respectfully requests the following claim constructions:

| Claim Term | Claim Construction |
|---|---|
| whereby the energy provided to the load forms a down-converted signal ('907 patent) | whereby the energy provided to the load generates a down-converted signal |
| a storage device storing energy from said UFT module ('940 patent) | a storage device storing energy from said UFT module and using that energy to generate a down-converted signal |

Respectfully submitted,

April 21, 2025                **KEKER VAN NEST & PETERS LLP**

By: */s/ Robert Van Nest*
    Robert A. Van Nest (special admission)
    Matthew M. Werdegar (special admission)
    Sophie Hood (special admission)
    Anjali Srinivasan (special admission)
    633 Battery Street
    San Francisco, CA 94111-1809
    Telephone: 415 391 5400
    Facsimile:  415 397 7188
    rvannest@keker.com
    mwerdegar@keker.com
    shood@keker.com
    asrinivasan@keker.com

    **CARLTON FIELDS, P.A.**
    Daniel C. Johnson
    Florida Bar No.  522880
    200 S. Orange Ave.
    Suite 1000
    Orlando, FL 32801
    Telephone: (407) 849-0300
    Facsimile:  (407) 648-9099
    djohnson@carltonfields.com

    **COOLEY LLP**
    Matthew Brigham (admitted pro hac vice)
    Dena Chen (admitted pro hac vice)
    3175 Hanover Street
    Palo Alto, CA  94304-1130
    Telephone: (650) 843-5000
    Facsimile:  (650) 843-7400
    Dchen@cooley.com
    Mbrigham@cooley.com

    **COOLEY LLP**
    Eamonn Gardner (admitted pro hac vice)
    1144 15th Street, Suite 2300
    Denver, CO 80202-2686
    Telephone: (720) 566-4000
    Facsimile:  (720) 566-4099
    Egardner@cooley.com

19

Attorneys for Defendants QUALCOMM
INCORPORATED and QUALCOMM
ATHEROS, INC.

2839078

# ATTACHMENT 1

No. 22-1755

# In The
# United States Court of Appeals
# for the Federal Circuit

---

PARKERVISION, INC.,

*Appellant,*

v.

QUALCOMM INCORPORATED, QUALCOMM ATHEROS, INC.,

*Appellees.*

---

Appeals from the United States District Court for the Middle District of Florida,
Case No. 6:14-cv-00687-PGB-KRS, the Honorable Paul G. Byron.

---

## BRIEF FOR APPELLANT PARKERVISION, INC.

---

Kevin L. Burgess
CALDWELL CASSADY CURRY PC
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
(214) 888-4848

Joel L. Thollander
Joshua W. Budwin
Matthew T. Cameron
R. Mitch Verboncoeur
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
(512) 692-8700

*Attorneys for Appellant*

August 18, 2022

1012-16. The switch-down-conversion '940 patent claims thus do not recite the "generating" limitation in *ParkerVision I*, and the question of infringement here is critically different from the question of infringement resolved in the prior litigation. Appx150, Appx163, Appx61607-61609, Appx48565-48576.

There should be little dispute on this point, and in its original estoppel motion in 2019, Qualcomm did not argue that *ParkerVision I* had any preclusive effect on the '940 patent receiver claims. Appx9597-9626. The district court appeared to understand this at the hearing, briefly acknowledging the dispositive point that the '940 patent claims require the UFT module to down-convert. Appx61609. But the court offered no substantive analysis of these claims in its order granting summary judgment on collateral estoppel. Appx7-8.

### b. The '907 patent receiver claims are materially different from the claims in *ParkerVision I*.

The receiver claims of the '907 patent are also switch-down-conversion claims. These method claims recite periodically coupling and uncoupling an electromagnetic signal—*e.g.*, with a switch—at a frequency less than twice that of the carrier signal, and in further critical part, "[p]roviding, during the periodic couplings, energy from the electromagnetic signal to the load … [w]hereby the energy provided to the load forms a down-converted signal." Appx425 (claim 1). These claims recite down-converted electric current that flows directly to the load— and thus, as matter of law and logic, could only have been down-converted at the

switch. Appx424-425, Appx10077, Appx415 (111:11, 31-33) (describing switch-down-conversion designs). This switch-down-converted signal recited in the '907 patent claims is consistent with this Court's description of the mixers in the accused products in *ParkerVision I*, 621 F. App'x. at 1013-15. Appx10077.

Of course, signals do not disappear after down-conversion. A switch-down-converted signal is typically processed on the way to extracting the information it bears, shaping the down-converted signal at different points in the receiving circuitry. Appx10078. The patents have many examples, such as the signals shown in Figures 57E and 57F. Appx248, Appx403 (87:28-38). The '907 patent claims cover and include this type of post-down-conversion processing. The load receives energy from two sources—(1) directly from the electromagnetic signal during the periodic couplings and (2) from the energy storage device between the period couplings—both of which emanate from switch-down-converted signals generated by periodically coupling and uncoupling an electromagnetic signal at a frequency less than twice that of the carrier signal. Appx10079.

ParkerVision's expert offered an illustrating diagram of this process:



Appx44112. The presence of the solid arrow, and the fact that it represents a switch-down-converted signal, is reflected in the recited claim limitations: "[p]roviding, during the periodic couplings, energy from the electromagnetic signal to the load … [w]hereby the energy provided to the load forms a down-converted signal." Appx425. Indeed, the claim limitations make clear that, as the diagram reflects, "during the period couplings," the same switch-down-converted energy is being provided *both* to the energy storage device *and* directly to the load." *Supra* pp. 10-12. Thus, in these "claims, all of the energy provided to the load comes from the switch-down-converted signal." Appx10344.

33

*ParkerVision I* cannot bar infringement of the '907 patent claims because these claims describe systems that use switches to down-convert signals. Indeed, the presence of a switch-down-converted signal in the accused products, as found in *ParkerVision I*, does not suggest non-infringement. It suggests the *opposite*. Because the switch-down-converted signal generated by Qualcomm's "double-balanced mixer" is a down-converted signal, so too is the signal formed in the load—just as recited in the '907 patent claims. Appx10344.

In *ParkerVision I*, this Court found that the "generating limitation" in the claims there "preclud[ed] a finding of infringement" because the "admission that the double-balanced mixer creates the baseband signal before that signal reaches the identified capacitors mean[t] that Qualcomm products obtained the baseband signal from 'somewhere other than' the energy stored in the capacitors." 621 F. App'x. at 1014. In the '907 patent claims, the switch down-converts the baseband signal before it reaches the capacitors, and, when the switch is closed, that down-converted signal is provided directly to the load. The signal is thus obtained "from 'somewhere other than' the energy stored in the capacitors." *Id.* In further contrast to the "generating" limitation in the *ParkerVision I* claims, the '907 patent claims simply recite that the "energy provided to the load [from the periodic couplings of a switch] forms" a down-converted signal. Appx425. The claim recites, that is, a signal that is formed through samples of already down-converted energy.

Respectfully submitted,

 */s/ Joshua W. Budwin*

Joel L. Thollander
Joshua W. Budwin
Matthew T. Cameron
R. Mitch Verboncoeur
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
(512) 692-8700

Kevin L. Burgess
CALDWELL CASSADY CURRY PC
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
(214) 888-4848

*Attorneys for Appellant*

# ATTACHMENT 2

1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3

4              Docket No. 3:11-CV-719

5

6

7    . . . . . . . . . . . . . .

8    PARKERVISION, INC.              :
                                     :          Orlando, Florida
9          Plaintiff                 :          October 7, 2013
                                     :          8:53 a.m.
10              v.                   :
                                     :
11   QUALCOMM, INCORPORATED          :
                                     :
12         Defendant                 :
     . . . . . . . . . . . . . .

13

14

15

16

17            TRANSCRIPT OF JURY TRIAL
                     DAY ONE
18    BEFORE THE HONORABLE ROY B. DALTON
             UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

```
1    APPEARANCES:

2

3    For the Plaintiff:  Douglas A. Cawley

4                        Joshua W. Budwin

5                        Leah Buratti

6                        Kevin Kneupper

7                        Stephen D. Busey

8                        Kevin Burgess

9

10

11   For the Defendant:  Stephen C. Neal

12                       Timothy S. Teter

13                       John DeVault

14

15

16

17

18

19

20

21   Court Reporter:    Amie R. First, RPR, CRR

22                      AmieFirst.CourtReporter@gmail.com

23

24   Proceedings recorded by mechanical stenography.

25   Transcript produced by Computer-Aided Transcription.
```

1  also it describes what type of load or output circuit it

2  needs to be hooked up to.

3  Q    So you've shown us a diagram for the patent and you've

4  shown us a lot of words, some of the words of the patent

5  that describe how that diagram operates.  Have you prepared

6  an animation to show us how the invention depicted in this

7  figure 82 of your patent works in operation?

8  A    Yes, sir.

9  Q    Can you take us through that?

10  A    Yes.

11  Q    What you see here is a basic diagram of an energy

12  transfer sampler where you have a carrier wave coming in on

13  the left.  It's amplified.  And what you see here is

14  instead of -- you may recall in the voltage sampler, there

15  was a hold device.  In this particular case, it's a storage

16  device.

17      The switch is closed for a much longer period of time

18  so that energy is actually transferred in the form of

19  charge to the storage device.

20      Let's see if I can get it going again.

21      So what you see, that green line there is you see the

22  energy building up on the -- the storage element when the

23  switch is closed.

24      Also, in an energy transfer sampler, we're not just

25  interested in putting energy in the cap.  We have to

```
1    transfer a portion of that energy to the output to make the
2    sample work properly.
3         So this is described in figure 59D.  And this is what
4    we call the charge and discharge or the generating step of
5    an energy sampler.
6    Q    I think you may have misspoken.  What is the figure
7    where that's described?
8    A    I'm sorry.  What did I say?  It's 59E.
9    Q    It is E.  I thought you said D?
10   A    I'm sorry.
11   Q    So even though energy transfer sampling and the old
12   voltage sampling both use these building blocks and
13   switches and capacitor, are they the same or are they
14   different?
15   A    They operate very differently, and the result is very
16   different.
17   Q    Did you explain that in your patent?
18   A    Yes, sir.
19   Q    How did you begin?
20   A    How did I begin?
21   Q    Let me show you some figures from the '551 patent.
22   What do we see on the left?
23   A    What we see is a contrast, if you will, a voltage
24   sampler, which I think we called under-sampling in the
25   patent.  And we actually -- we actually do a side-by-side
```

1           It will come to me.  I'll see you in the morning.

2           MR. NEAL:  Thank you, Your Honor.

3           (Proceedings adjourned at 4:54 p.m. until

4            Tuesday, October 8, 2013, at 9:00 p.m.)

5

6               C E R T I F I C A T E

7

8       I certify that the foregoing is a correct

9   transcript from the record of proceedings in the

10  above-entitled matter.

11

12  s\Amie R. First, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>**INDEX**</u>

2      Opening Statement Plaintiff .................... 139
       Opening Statement Defendant .................... 167
3

4      <u>**EXHIBITS**</u>

5                                            <u>R E C E I V E D</u>

6      Joint Exhibits 1-98                    192
       Plaintiff's Exhibit 24                 241
7      Plaintiff's Exhibit 479                243
       Plaintiff's Exhibit Unknown            248
8

9      <u>**PLAINTIFF WITNESSES**</u>

10                          D I R E C T   C R O S S   R E D I R E C T   R E C R O S S

11     DAVID SORRELLS              193

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# ATTACHMENT 3

```
1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3

4              Docket No. 3:11-CV-719

5

6

7    . . . . . . . . . . . . . . . .

8    PARKERVISION, INC.          :
                                 :        Orlando, Florida
9         Plaintiff             :        October 8, 2013
                                 :        8:57 a.m.
10             v.                :
                                 :
11   QUALCOMM, INCORPORATED      :
                                 :
12        Defendant             :
     . . . . . . . . . . . . . . . .
13

14

15

16

17           TRANSCRIPT OF JURY TRIAL
                      DAY TWO
18      BEFORE THE HONORABLE ROY B. DALTON
           UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:  Douglas A. Cawley

 4                       Joshua W. Budwin

 5                       Leah Buratti

 6                       Kevin Kneupper

 7                       Stephen D. Busey

 8                       Kevin Burgess

 9

10   For the Defendant:  Stephen C. Neal

11                       Timothy S. Teter

12                       John DeVault

13

14

15

16

17

18

19

20

21   Court Reporter:    Amie R. First, RPR, CRR
                        AmieFirst.CourtReporter@gmail.com
22

23

24   Proceedings recorded by mechanical stenography.

25   Transcript produced by Computer-Aided Transcription.
```

| | | |
|---|---|---|
| 11:05:51 | 1 | A    It means a signal with a frequency below the carrier |
| 11:05:54 | 2 | signal frequency. |
| 11:05:56 | 3 | Q    And has the Court actually decided that it should be |
| 11:05:58 | 4 | given its plain and ordinary meaning? |
| 11:06:02 | 5 | A    I don't know what you mean.  Yes. |
| 11:06:06 | 6 | Q    Well, what does this term mean? |
| 11:06:08 | 7 | A    Oh, the last term, the generated term? |
| 11:06:14 | 8 | Q    Yes, sir. |
| 11:06:14 | 9 | A    The generated term is how the patents describe that |
| 11:06:18 | 10 | the lower frequency signal is generated from the |
| 11:06:20 | 11 | transferred energy. |
| 11:06:21 | 12 | Q    Is this portrayed in some of your earlier slides |
| 11:06:25 | 13 | describing your invention? |
| 11:06:27 | 14 | A    Yes, sir. |
| 11:06:28 | 15 | Q    Can you explain it to us using this diagram? |
| 11:06:31 | 16 | A    Yes. |
| 11:06:31 | 17 |      Again, you've seen this before where non-negligible |
| 11:06:37 | 18 | amounts of energy are transferred into the storage device. |
| 11:06:41 | 19 | You'll see when the switch is closed, the amount of energy |
| 11:06:43 | 20 | increases. |
| 11:06:44 | 21 |      You'll also see when the switch opens, that a portion |
| 11:06:46 | 22 | of that energy, the energy decreases. |
| 11:06:50 | 23 |      Between when the switch is opened, in order to |
| 11:06:53 | 24 | generate the baseband signal from the transferred energy, |
| 11:06:56 | 25 | that energy has to be transferred to the next stage or |

11:07:00    1    discharged from the storage device.

11:07:03    2        You see that described in figure 59E of the '551

11:07:09    3    patent, where you see the distinct charge when the switch

11:07:12    4    is closed, and you see the discharge, the line that droops

11:07:17    5    down.

11:07:18    6    Q    Does the specification or the written description in

11:07:21    7    the '551 patent discuss this generating element?

11:07:25    8    A    Yes, sir.

11:07:26    9    Q    Can you show us where that is?

11:07:29    10   A    Yes, sir.

11:07:31    11       Again, we're looking at a blowup of figure 57E.  And

11:07:36    12   we also show that figure -- the element of that drawing,

11:07:43    13   57 10(b), we show that it represents the energy stored in a

11:07:50    14   storage device continuing to drive the load.

11:07:54    15   Q    So what evidence can you point us to that shows us the

11:07:58    16   Qualcomm 6270 chip generates the lower frequency signal

11:08:03    17   from the transferred energy?

11:08:04    18   A    Again, going back to the chip, we can look at their

11:08:07    19   circuit configuration here.  And here is where Qualcomm

11:08:12    20   generates the -- this circuitry allows them to generate the

11:08:18    21   lower frequency signal from the transferred energy.

11:08:21    22   Q    Is there evidence in the reverse engineering report?

11:08:24    23   A    Yes, sir.

11:08:24    24   Q    Can you show us that?

11:08:28    25   A    It's this circuit showing the paper can be found in

14:11:39    1    device, correct?

14:11:42    2    A    Yes, sir.

14:11:42    3    Q    But in your invention, that's a capacitor?

14:11:44    4    A    It's one of the storage devices detailed in the

14:11:47    5    patents, yes.

14:11:49    6    Q    Okay.  And in energy transfer, the energy that's

14:11:53    7    transferred into the storage device is the same energy that

14:11:57    8    is then used to generate the lower frequency signal,

14:12:01    9    correct?

14:12:06    10    A    Yes.  Yes, sir.

14:12:07    11    Q    And in the demonstrative -- I think we've touched on

14:12:11    12    this.  In the demonstrative we have on the screen, which is

14:12:14    13    your Exhibit PDX-35, the baseband signal comes out of the

14:12:20    14    storage device.  Is that right?

14:12:23    15    A    Yes.  When the switch is open, current is

14:12:25    16    transferred -- voltage and current is transferred to the

14:12:28    17    output and that generates the baseband signal.

14:12:31    18    Q    But just so we're clear, what's happening is that the

14:12:34    19    energy that is transferred into the storage device by the

14:12:38    20    switch, that energy that's transferred into the storage

14:12:43    21    device is then used to generate the baseband as it comes

14:12:46    22    out of the storage device, correct?

14:12:48    23    A    Yes, sir.

14:12:52    24    Q    So, again, in order to prove that any of the accused

14:12:55    25    products of Qualcomm transfer energy -- well, let me strike

```
16:51:24   1              (Proceedings adjourned at 4:51 p.m. until
16:51:25   2               Wednesday, October 9, 2013, at 9:00 a.m.)

           3

           4                 C E R T I F I C A T E

           5

           6         I certify that the foregoing is a correct

           7    transcript from the record of proceedings in the

           8    above-entitled matter.

           9

          10    s\Amie R. First, RPR, CRR

          11

          12                         INDEX

          13

          14    PLAINTIFF WITNESSES

          15                              DIRECT  CROSS  REDIRECT  RECROSS

          16    DAVID SORRELLS              9      93      238

15:15:49  17

15:15:49  18    EXHIBITS

15:15:49  19                                        ADMITTED

15:15:49  20    Defendant's Exhibit 835                 139
15:15:49        Defendant's Exhibits 421,  435          139
          21

          22

          23

          24

          25
```